# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, | ) ) ) | |
| *et al.*, | ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:20-cv-02107 (JEB) |
| v. | ) ) | |
| DONALD J. TRUMP, *et al.*, | ) ) | |
| Defendants. | ) ) ) ) | |

## **DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

   I.   Factual Background ........................................................................................ 2

   II.  Legal Background ........................................................................................... 6

      A.  Section 504 of the Rehabilitation Act and Implementing Regulations ...................... 6

      B.  The Administrative Procedure Act ............................................................ 8

LEGAL STANDARDS ................................................................................................... 9

ARGUMENT ................................................................................................................. 10

   I.   Plaintiffs Are Not Likely To Succeed on the Merits of Their Claims ............................. 10

      A.  Plaintiffs Lack a Cause of Action Under Section 504 ................................................. 11

      B.  Defendants Are Not Agencies Within the Scope of the APA .................................... 14

      C.  Plaintiffs Are Not Likely to Succeed on Their Claim for Mandamus ........................ 19

   II.  The Remaining Factors Do Not Favor Issuance of a Preliminary Injunction.................. 22

CONCLUSION ............................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Abdullah v. Obama*,
   753 F.3d 193 (D.C. Cir. 2014) ................................................................. 9

\* *Alexander v. Sandoval*,
   532 U.S. 275 (2001) ............................................................... 11, 12, 14

*Am. Council of the Blind v. Paulson*,
   525 F.3d 1256 (D.C. Cir. 2008) ............................................................ 13

*Armstrong v. Exec. Off. of the President*,
   90 F.3d 553 (D.C. Cir. 1996) ............................................................... 18

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
   997 F.2d 898 (D.C. Cir. 1993) ............................................................. 16

*Cheney v. U.S. Dist. Ct. for D.C.*,
   542 U.S. 367 (2004) ......................................................................... 19

*Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*,
   566 F.3d 219 (D.C. Cir. 2009) ........................................................ 17, 18

*Clark v. Skinner*,
   937 F.2d 123 (4th Cir. 1991) .............................................................. 11

*Consol. Edison Co. of N.Y., Inc. v. Ashcroft*,
   286 F.3d 600 (D.C. Cir. 2002) ............................................................ 20

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
   880 F.2d 603 (1st Cir. 1989) .............................................................. 11

*Dalton v. Specter*,
   511 U.S. 462 (1994) ..................................................................... 16, 18

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) .................................................. 9, 10, 22

*Democracy Forward Found. v. White House Off. of Am. Innovation*,
   356 F. Supp. 3d 61 (D.D.C. 2019) ....................................................... 19

*Dep't of the Army v. Blue Fox, Inc.*,
   525 U.S. 255 (1999) ......................................................................... 14

*Detroit Int'l Bridge Co. v. Gov't of Can.*,
    883 F. 3d 895 (D.C. Cir. 2018) ............................................................ 16

*Doe v. Att'y Gen.*,
    941 F.2d 780 (9th Cir. 1991) ............................................................. 11

*Doe v. Exxon Mobil Corp.*,
    473 F.3d 345 (D.C. Cir. 2007) ............................................................ 19

*Dorfmann v. Boozer*,
    414 F.2d 1168 (D.C. Cir. 1969) .......................................................... 10

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    266 F. Supp. 3d 297 (D.D.C. 2017) ...................................................... 9

\* *Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ..................................................... 9, 15, 16, 18

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ..................................................................... 23

*Guedes v. ATF*,
    920 F.3d 1 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020) ............................................. 9

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .......................................................................... 8

*In re Cheney*,
    406 F.3d 723 (D.C. Cir. 2005) ............................................... 19, 20, 22

*In re Medicare Reimbursement Litig.*,
    414 F.3d 7 (D.C. Cir. 2005) ............................................................... 20

*In re Navy Chaplaincy*,
    738 F.3d 425 (D.C. Cir. 2013) ............................................................ 10

*J.L. v. Soc. Sec. Admin.*,
    971 F.2d 260 (9th Cir. 1992) .............................................................. 11

*Kinneary v. City of N.Y.*,
    358 F. Supp. 2d 356 (S.D.N.Y. 2005).................................................. 11

*Kissinger v. Reps. Comm. for Freedom of the Press*,
    445 U.S. 136 (1980)................................................................ 15, 16, 19

*Lane v. Pena*,
    518 U.S. 187 (1996)....................................................................... 11, 12

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ................................................................................................. 9

*Meyer v. Bush,*
   981 F.2d 1288 (D.C. Cir. 1993) ................................................................ 9, 16, 17, 18

*Nat'l Sec. Archive v. Archivist of the U.S.,*
   909 F.2d 541 (D.C. Cir. 1990) ........................................................................... 18, 19

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................................... 22

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) ................................................................................................. 19

*Pac. Legal Found. v. Council on Envtl. Quality,*
   636 F.2d 1259 (D.C. Cir. 1980) ............................................................................. 17

*Pittston Coal Grp. v. Sebben,*
   488 U.S. 105 (1988) ............................................................................................... 20

*Rushforth v. Council of Econ. Advisers,*
   762 F.2d 1038 (D.C. Cir. 1985) ....................................................................... 16, 18

*Sai v. Dep't of Homeland Sec.,*
   149 F. Supp. 3d 99 (D.D.C. 2015) ..................................................... 11, 12, 14, 21

*Sculimbrene v. Reno,*
   158 F. Supp. 2d 26 (D.D.C. 2001) ..................................................................... 18, 19

*Se. Cmty. Coll. v. Davis,*
   442 U.S. 397 (1979) ............................................................................................... 13

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011) ...................................................................... 9, 10, 22

*Shoshone Bannock Tribes v. Reno,*
   56 F.3d 1476 (D.C. Cir. 1995) ............................................................................... 20

*Sierra Club v. Andrus,*
   581 F.2d 895 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1979) ........ 17

*Singh v. Carter,*
   185 F. Supp. 3d 11 (D.D.C. 2016) ......................................................................... 10

*Soucie v. David,*
   448 F.2d 1067 (D.C. Cir. 1971) .................................................................. 15, 16, 17

*Sweetland v. Walters*,
  60 F.3d 852 (D.C. Cir. 1995) ........................................................................... 17, 18

*Wilbur v. United States*,
  281 U.S. 206 (1929) .............................................................................................. 20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................... 9

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................................. 22

**STATUTES**

5 U.S.C. § 551 ...................................................................................................... 8, 15

5 U.S.C. § 552 .......................................................................................................... 15

5 U.S.C. §§ 701-706 .................................................................................................. 8

5 U.S.C. § 701 ............................................................................................................ 8

5 U.S.C. § 702 ...................................................................................................... 9, 14

5 U.S.C. § 706 ............................................................................................................ 8

10 U.S.C. § 111 .......................................................................................................... 4

29 U.S.C. § 705 ........................................................................................................ 23

29 U.S.C. § 794 ..................................................................................... 1, 6, 12, 23

29 U.S.C. § 794a ................................................................................................. 6, 12

47 U.S.C. § 255 ................................................................................................ 10, 21, 23

Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978,
  Pub. L. No. 95-602, 92 Stat. 2955 ..................................................................... 6, 13

National Defense Authorization Act for Fiscal Year 1997,
  Pub. L. No. 104-201, 110 Stat. 9623 ...................................................................... 4

Rehabilitation Act Amendments of 1998,
  Pub. L. No. 105-220, 112 Stat. 936 ...................................................................... 13

**REGULATIONS**

3 C.F.R. part 102 ........................................................................................................ 7, 13

3 C.F.R. § 102.103 ................................................................................................. 7, 8, 14

3 C.F.R. § 102.149 .......................................................................................................... 7

3 C.F.R. § 102.150 .......................................................................................................... 7

3 C.F.R. § 102.160 ............................................................................................... 7, 8, 21

3 C.F.R. § 102.170 ................................................................................................... 8, 14

**OTHER AUTHORITIES**

H.R. Rep. No. 93-1380 (1974)……………………………………………..……………………..16

## INTRODUCTION

With the nation facing a worldwide pandemic, the White House has worked diligently to ensure the public has timely access to important public health information. Holding press briefings – by the President, the Vice President, the Coronavirus Task Force, or the Press Secretary – is one of multiple ways the White House provides such access. Briefings broadcasted on network and cable television include closed captioning, as required by federal law. In addition, the White House provides closed captioning to include with broadcasts on online platforms. Further, within hours of the briefings, the White House posts a complete transcript on its official website and provides the same to the press.

Notwithstanding these avenues and non-auditory means of disseminating the content of the briefings, Plaintiffs, five individuals who are deaf or hard of hearing and an association that advocates on behalf of individuals with similar disabilities, claim they are being denied access to information because the White House does not also include live American Sign Language ("ASL") interpretation at each briefing. This, they claim, constitutes disability-based discrimination in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Plaintiffs also ask this Court to preliminarily enjoin the White House to require the President and his staff immediately to begin providing live, televised ASL interpretations at these press briefings.

Plaintiffs' motion for preliminary injunction should be denied. Although Plaintiffs allege that issues with real-time closed captioning or follow-on transcripts make live ASL interpretation preferable for them, the White House has provided and continues to provide accessibility to all coronavirus press briefings through alternative, non-auditory means. The White House has

consistently engaged in significant efforts to provide broad accessibility to public health information delivered in coronavirus press briefings to all members of the public.

Further, Plaintiffs have not demonstrated a likelihood of success on the merits of their claims, part of the burden they must sustain when seeking the extraordinary relief of a preliminary injunction. Most importantly, as a threshold matter, Plaintiffs cannot identify a federal cause of action that permits their lawsuit. Section 504 does not create a private right of action for individuals such as Plaintiffs to challenge agency determinations relating to the conduct of their programs and activities. Nor does the Administrative Procedure Act ("APA"), the only other possible avenue for maintaining this suit, because that statute does not apply to the President or the remaining Defendants, whose primary function is to assist and advise the President. Even if the APA applied, Plaintiffs have not demonstrated entitlement to the specific mandatory injunction sought here. Finally, Plaintiffs' claim for mandamus is also unlikely to succeed because they fail to set forth, in clear and indisputable terms, that defendants have a nondiscretionary legal duty to supply live, in-frame ASL interpretation of all public briefings related to the coronavirus pandemic. Finally, although Plaintiffs' failure to show likelihood of success on the merits makes it unnecessary to address Plaintiffs' claim of irreparable harm or to weigh the balance of hardships and public interest, these remaining factors do not favor issuance of a preliminary injunction in this case.

Thus, Plaintiffs' request for a mandatory preliminary injunction to require live, in-frame ASL interpretation at all public briefings related to the coronavirus should be denied.

## BACKGROUND

### I.   Factual Background

The Executive Office of the President ("EOP") includes the immediate staff to the President and the Vice President. Declaration of Judson Deere ("Deere Declaration"), ¶ 2. As

relevant here, EOP includes the White House Office, which, in turn, includes the White House Press Office ("Press Office") and the Press Secretary. Deere Declaration, ¶ 2.

The coronavirus press briefings provide an opportunity for the President, the Vice President, Press Secretary, or other officials to respond to questions from multiple news outlets. Deere Declaration, ¶ 4. The Press Office typically convenes these briefings by notifying the reporters and networks covering the White House. Deere Declaration, ¶ 4.

In consultation with other senior White House advisors, the Press Office determines when briefings in the James S. Brady Press Briefing Room ("Press Briefing Room") or other designated spaces will occur. Deere Declaration, ¶ 3. The Press Briefing Room is a small space; at full capacity, it offers seating for only approximately 49 reporters (and a small contingent of camera engineers, audio technicians, still photographers, and producers). Deere Declaration, ¶ 9. During recent months, seating has been further limited to facilitate social distancing as recommended by the Centers for Disease Control and Prevention. Deere Declaration, ¶ 9. The speaker's podium is not easily moved due to electrical wiring that runs through it. Deere Declaration, ¶ 9.

The Press Office works with members of the media and media outlets from around the world, largely through the White House Correspondents Association ("WHCA"). Deere Declaration, ¶ 5. WHCA comprises hundreds of television, print, and radio media organizations, and serves to organize and provide news coverage of the President and the presidency. Deere Declaration, ¶ 5. Due to space constraints, only a limited number of networks' cameras are stationed at the back of the Press Briefing Room. Deere Declaration, ¶ 5. These networks, in turn, share their footage of press briefings held in the Press Briefing Room with other networks. Deere Declaration, ¶ 5.

Neither the White House nor the Press Office controls which networks will decide to broadcast the briefings, either live or recorded. Deere Declaration, ¶ 6. Nor does the White House or the Press Office control the video decisions made by the networks operating the press cameras – for example, the subject(s) of the camera's focus; whether a tight shot or wide shot is used, and therefore, how much of the subject or their surrounding environment is captured; and whether and when to pan away from the subject(s). Deere Declaration, ¶ 6. Even if an interpreter were present, the decision whether the video broadcast by a particular network would include the interpreter in-frame would be made by the network, not by the White House or the Press Office. Deere Declaration, ¶ 6. Because the networks operating the press cameras determine when to flip between shots of the individual at the podium and any reporter in the audience, the determination to capture a reporter's question through an in-frame interpreter also would be made and controlled by the networks, not the White House or the Press Office. Deere Declaration, ¶ 6.

The Department of Defense, through the White House Communications Agency, provides telecommunications support to the President, including by capturing video of the President's press briefings. Deere Declaration, ¶ 8; *see* National Defense Authorization Act for Fiscal Year 1997, Pub. L. No. 104-201, Div. A, Title IX, Subtitle A, § 912, 110 Stat. 9623 (10 U.S.C. § 111 note). Sometimes, the video captured by the White House Communications Agency is used to provide a real-time stream on the White House website, as well as other online platforms such as YouTube and Facebook. Deere Declaration, ¶ 8. In other instances, the real-time stream on the White House website, and consequently on other online platforms, comes from the White House correspondents' pooled feed. Deere Declaration, ¶ 8. Although the White House does not host video following the conclusion of the real-time stream, the White House page on YouTube and Facebook hosts the recordings after the live event concludes. Deere

Declaration, ¶ 8. Any member of the public can view a press briefing, either live or recorded, on YouTube with captioning provided by the White House through a contractor. Deere Declaration, ¶ 8. The White House also provides captioning through a contractor to be included with recordings of press briefings available on Facebook. Deere Declaration, ¶ 8.

Consistent with the standard historical practice at the White House during at least the last three Presidential Administrations, ASL interpretation has not been provided at public briefings. Deere Declaration, ¶ 11. This has been true for press briefings on matters related to significant national emergencies and events that, in some cases, endure for several years (e.g. military operations in Iraq). Deere Declaration, ¶ 12. Nevertheless, in addition to any closed captioning provided by the networks in accordance with their legal obligations, Deere Declaration ¶ 13, the White House provides the information from the press briefings through alternative means. Deere Declaration, ¶ 14. For instance, in addition to the captioned video uploads already described, for all White House Coronavirus Task Force briefings, the White House posts on the official White House website, generally within a few hours, a transcript of the full press briefing. Deere Declaration, ¶ 14. The White House Press Office also distributes each full transcript to reporters and media organizations. Deere Declaration, ¶ 14.

Plaintiffs are the National Association of the Deaf ("NAD") and five individuals who, themselves, are deaf, Complaint ("Compl."), ECF No. 1, ¶¶ 11-16. Plaintiffs request live ASL interpretation during public briefings concerning the coronavirus. Compl. ¶ 1. Plaintiffs allege they have attempted to watch the coronavirus briefings but are unable to understand them without an ASL interpreter. Compl. ¶¶ 12-16.

II.   <u>**Legal Background**</u>

    A.    **Section 504 of the Rehabilitation Act and Implementing Regulations**

Section 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act"), 29 U.S.C. §

794, prohibits federal agencies and recipients of federal financial assistance from conducting

programs or activities that discriminate on the basis of disability. Although section 504 originally

applied only to recipients of federal funds, Congress amended the statute in 1978 to apply its

provisions to federal agencies' programs or activities. *See* Rehabilitation, Comprehensive

Services, and Developmental Disabilities Act of 1978, Pub. L. No. 95-602, 92 Stat. 2955 (Nov.

6, 1978). As amended, Section 504 provides that:

> No otherwise qualified individual with a disability in the United States . . . shall,
> solely by reason of her or his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any program or
> activity . . . conducted by any Executive agency . . . .

29 U.S.C. § 794(a). Section 504 further provides that "[t]he head of each [Executive] agency

shall promulgate such regulations as may be necessary to carry out" the 1978 Amendments to the

Act, which extended its protections to "program[s] or activit[ies]" conducted by federal agencies.

*Id.* Neither section 504 nor any other section of the Rehabilitation Act defines the statutory term

"Executive agency."

Section 505(a)(2), 29 U.S.C. § 794a(a)(2), sets forth the remedies for alleged violations

of section 504. Specifically, section 505(a)(2) provides:

> The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of
> 1964 . . . shall be available to any person aggrieved by any act or failure to act by
> any recipient of Federal assistance or Federal provider of such assistance under
> section [504] of [the Rehabilitation Act].

*Id.* Notably, while this provision authorizes specific remedies for any section 504 violation

committed by a *nonfederal* recipient of federal funds or by a federal agency that provides such

funds, it does not create remedies for alleged disability discrimination under any programs or activities conducted by a federal agency.

Following the 1978 amendments, the Office of Administration ("OA") within the EOP promulgated a regulation in 1988 that implements section 504 for the EOP components identified. *See* 3 C.F.R. part 102. The regulation defines "agency" to mean:

> for purposes of this regulation only, the following entities in the Executive Office of the President: the White House Office, the Office of the Vice President, the Office of Management and Budget, the Office of Policy Development, the National Security Council, the Office of Science and Technology Policy, the Office of the United States Trade Representative, the Council on Environmental Quality, the Council of Economic Advisers, the Office of Administration, the Office of Federal Procurement Policy, and any committee, board, commission, or similar group established in the Executive Office of the President.

3 C.F.R. § 102.103.

The regulation provides generally that "no qualified individual with handicaps shall, because the agency's facilities are inaccessible to or unusable by individuals with handicaps, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity conducted by the agency." *Id.* at § 102.149. With some exceptions, EOP "shall operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with handicaps." *Id.* at § 102.150(a). Thus, for example, each agency within EOP "shall take appropriate steps to ensure effective communication with applicants, participants, personnel of other Federal entities, and members of the public." *Id.* at § 102.160(a). The agency is required to "furnish auxiliary aids where necessary to afford an individual with . . . equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the agency." *Id.* at § 102.160(a)(1). However, the regulation leaves to the agency the discretion to determine "what type of auxiliary aid is necessary," giving "primary consideration to the requests of the individual." *Id.* at §

102.160(a)(1)(i). In determining what aid is necessary, an agency within EOP is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative burdens." *Id.* at § 102.160(d). Instead, "the agency shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that . . . individuals with handicaps receive the benefits and services of the program or activity." *Id.*

Finally, the regulations set forth a process for resolving any disputes through the filing and consideration of administrative complaints. 3 C.F.R. § 120.170. As relevant here, administrative complaints may be sent to the Director of Facilities Management, Office of Administration, at an address provided. *Id.* at § 120.170(c). Among other requirements, a "complete complaint" must include "a written statement that contains the complainant's name and address and describes the agency's alleged discriminatory action in sufficient detail to inform the agency of the nature and date of the alleged violation of section 504." *Id.* at § 102.103. All "complete complaints" are to be investigated and decided in writing within a set time period. *Id.* at § 120.170(d). Decisions with which a complainant is dissatisfied may be administratively appealed. *Id.*

### B.     The Administrative Procedure Act

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected either by agency action or by an agency's failure to act. *See* 5 U.S.C. §§ 702, 706(1)-(2); *see also Heckler v. Chaney*, 470 U.S. 821, 828 (1985). These provisions apply only to "agency" action. 5 U.S.C. § 551. The APA defines an "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," with certain exceptions. 5 U.S.C. §§ 551(1), 701(b)(1). As discussed in greater detail below, this definition

has been held to exclude from its scope the President of the United States, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), the Vice President, *Meyer v. Bush*, 981 F.2d 1288, 1295 (D.C. Cir. 1993), or components of EOP that are comprised of close advisors to the President, *see, e.g., Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 315 (D.D.C. 2017).

## LEGAL STANDARDS

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (citation omitted)). To meet this burden, a plaintiff must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "'When seeking a preliminary injunction, the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). Although the last two factors tend to merge when the government is the opposing party, *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020), a plaintiff cannot prevail without some showing on each of the four factors. *See Winter*, 555 U.S. at 23-24, 31-32 (holding that "proper consideration of" balance of equities and public interest "alone requires denial of the requested

injunctive relief" and thus finding no need to address likelihood of success).[1] Finally, where, as here, the preliminary injunction sought would be a mandatory one, meaning that its terms would alter rather than preserve the status quo, the Court's power to issue a preliminary injunction "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted).

## ARGUMENT

### I.      <u>Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims</u>

Plaintiffs' request for a preliminary injunction to require the inclusion of live ASL interpreters at all public briefings that "address issues concerning COVID-19," Pls.' Proposed Order, ECF No. 2-2 ("Proposed Order"), should be rejected. The information conveyed during the White House coronavirus briefings is available through multiple methods, including closed captioning during live broadcasts, as required by the Telecommunications Act of 1996, 47 U.S.C. § 255, and through full transcripts generally available within hours after the briefings' conclusions. Defendants thus provide access to pandemic-related information through alternative, non-auditory means.

Nor can Plaintiffs satisfy the stringent requirements necessary to support the imposition of a mandatory preliminary injunction. *See Sherley*, 644 F.3d at 393. Plaintiffs are unlikely to succeed on the merits of their claims because they lack a cause of action under section 504 to challenge the conduct of federal programs or activities. Nor could the APA supply a cause of action because Defendants are not agencies within the meaning of the APA. Finally, Plaintiffs'

---

[1] The D.C. Circuit "has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions . . . . The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter* . . ." *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013)); *see also Davis*, 571 F.3d at 1295-96 (Kavanaugh, J., concurring).

mandamus claim must be rejected because Defendants have not failed to perform a ministerial

duty. Thus, Plaintiffs are not entitled to a preliminary injunction.

### A.      Plaintiffs Lack a Cause of Action Under Section 504

Plaintiffs are unlikely to succeed on the merits of their claims because section 504 does

not supply a private cause of action to enforce the nondiscrimination requirements at issue

against an Executive agency with respect to the operation of its programs or activities. *Sai v.*

*Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 112 (D.D.C. 2015) ("Plaintiff does not have a cause

of action under the Rehabilitation Act to remedy" the agency's alleged noncompliance with its

regulations for processing administrative complaints.).

"[P]rivate rights of action to enforce federal law must be created by Congress."

*Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Determining whether Congress has created a

private right of action requires the Court "to interpret the statute Congress has passed to

determine whether it displays an intent to create not just a private right but also a private

remedy." *Id.* Although the Rehabilitation Act creates a private right of action against non-federal

entities receiving federal financial assistance, the statute does not create a private right of action

against federal agencies in their operation of federally-run programs or activities.[2] *Sai*, 149 F.

Supp. 3d at 112.

The "remedies" provision for section 504 – section 505(a)(2) – does not supply a private

right of action to enforce its provisions in this context. *Lane v. Pena*, 518 U.S. 187, 197 (1996).

The remedies provision grants remedies for disability discrimination "to any person aggrieved by

---

[2] *See, e.g.*, *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 605-06 (1st Cir. 1989)
(en banc) (Breyer, J.); *Clark v. Skinner*, 937 F.2d 123, 125-26 (4th Cir. 1991); *Kinneary v. City
of N.Y.*, 358 F. Supp. 2d 356, 359-60 (S.D.N.Y. 2005); *but see, e.g., J.L. v. Soc. Sec. Admin.*, 971
F.2d 260, 264 (9th Cir. 1992) (private right of action against federal agencies operating federal
programs is available under section 504); *Doe v. Att'y Gen.*, 941 F.2d 780, 794-95 (9th Cir.
1991)(same).

any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section [504] of this title." 29 U.S.C. § 794a(a)(2). But it authorizes remedies only against federal agencies providing federal assistance. Thus, section 505(a)(2) creates a private right of action against federal agencies only when they provide funds to non-federal entities and not when they conduct their own programs and activities. *Lane*, 518 U.S. at 193.

Indeed, the Rehabilitation Act "says nothing about the remedies available to a person aggrieved by discrimination in a 'program or activity conducted by an[] Executive agency,' [29 U.S.C.] § 794(a)[.]" *Sai*, 149 F. Supp. 3d. at 113 (citing *Lane*, 518 U.S. at 192). Section 504, itself, cannot support an express right of action against federal agencies concerning the conduct of federal programs or activities. It directs federal agencies only to establish administrative processes to remedy violations in federal programs. 29 U.S.C. § 794. Under the plain language of the statute, therefore, an individual asserting disability discrimination in the operation of a federal program or activity must raise that claim with the agency through the agency's administrative complaint procedures under its applicable regulations.

The statute likewise does not imply a cause of action against federal agencies conducting programs under section 504. *Sai*, 149 F. Supp. 3d at 112. As in *Sandoval*, the statutory requirement to adopt implementing regulations lacks the necessary "rights-creating language." *Sandoval*, 532 U.S. at 288-89; *Sai*, 149 F. Supp. 3d at 112. Congress's decision to use the administrative complaint process rather than federal courts to resolve section 504 claims against federal agencies mandates the conclusion that section 504 does not confer an implied private right of action.

The statutory history of section 504 reinforces this conclusion. By adding to section 504 a prohibition against discrimination in "any program or activity conducted by any Executive

agency" without amending the remedies language in section 505, the 1978 Amendments underscore that Congress did not intend to create a private right of action against Executive agencies for allegations of discrimination in their programs or activities. *See* 92 Stat. at 2982. Instead, Congress established a comprehensive administrative scheme, *id.* at 2982–83, and it required federal agencies to promulgate regulations "to carry out" the changes to section 504, *id.* at 2982; *see Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 411 n.11 (1979). But the only change made by the Amendments (other than the insertion of the requirement to promulgate regulations) was the extension of section 504 to programs and activities conducted by Executive agencies. In response to the Amendments, many federal agencies adopted regulations allowing persons who allege section 504 violations in federal programs or activities to pursue the resolution of those disputes by filing administrative complaints. The EOP adopted such regulations. *See* 3 C.F.R. part 102.

In 1998, Congress reiterated that the remedy for section 504 violations in federal programs is administrative. In the course of amending section 508 of the Rehabilitation Act, Congress specified that section 504 violations in federal programs are to be "resolv[ed]" with administrative, rather than judicial, complaints. Rehabilitation Act Amendments of 1998, Pub. L. No. 105-220, 112 Stat. 936, 1092-1242.[3]

---

[3] The D.C. Circuit has not squarely addressed the issue of whether section 504 waives sovereign immunity for suits against Executive agencies. At most, the court of appeals in dicta has observed that the government's determination on appeal not "to challenge the applicability of section 504 is understandable given the expansive meaning of the words 'program or activity.'" *Am. Council of the Blind v. Paulson,* 525 F.3d 1256, 1266 n.13 (D.C. Cir. 2008) (citations omitted). Such a passing remark is not binding precedent and, thus, has no effect on the government's position here that section 504 does not allow a private cause of action against the Defendants.

Nor does EOP's regulation supply a private right of action. Regulatory language alone cannot supply a private right of action not found in the statute. *Sandoval*, 532 U.S. at 291 ("[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."); *Sai*, 149 F. Supp. 3d at 112. Moreover, the regulation at issue here does not purport to create a right of action but simply affords plaintiffs the opportunity to submit an administrative complaint of disability discrimination, which the agency will investigate and resolve.[4] *See, e.g.*, 3 C.F.R. § 102.170.

For all these reasons, just as the statute does not create an *express* cause of action for Plaintiffs, "the Rehabilitation Act does not provide an implied cause of action for discrimination in federal programs and activities (or for failure to comply with administrative procedures)." *Sai*, 149 F. Supp. 3d at 115.

## B.   Defendants Are Not Agencies Within the Scope of the APA

Plaintiffs also are not able to pursue their claims under the APA. For those who have filed an administrative complaint under section 504 against a federal agency and are unsatisfied with the agency's response, filing suit under the APA is generally the avenue for judicial review. The APA generally waives sovereign immunity for "[a]n action in a court of the United States seeking relief other than money damages." 5 U.S.C. § 702; *see, e.g., Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260-63 (1999). But the APA permits a plaintiff to seek relief only

---

[4] The Plaintiffs attached to the Complaint letters addressed to the White House requesting ASL interpretation at public briefings concerning the coronavirus. Compl. Exhs. A-E. However, the only Plaintiff in this case to have submitted correspondence to the White House requesting ASL interpretation at public coronavirus briefings was the National Association of the Deaf ("NAD"). Compl. Exh. C. NAD's letter does not appear to satisfy the requirements for a "complete complaint" under EOP's regulation governing administrative complaints, as it fails to include any mention of the Rehabilitation Act, let alone sufficient details to enable the recipient to fully comprehend either the nature of the alleged discriminatory action or the basis for the requested remedy. 3 C.F.R. § 102.103.

against "agencies," 5 U.S.C. § 551(1), and Defendants are not "agencies" subject to judicial review under the APA. *See Franklin,* 505 U.S. at 800-01 (the President is not subject to the APA).

The Supreme Court and the D.C. Circuit have consistently recognized that while the statutory definition of "agency" may be broad, it does not encompass entities within the Executive Office of the President that do not exercise substantial independent authority. In *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), the Court of Appeals concluded that the APA "apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Id.* Following this reasoning, the court held that the Freedom of Information Act ("FOIA"), which at the time incorporated the APA's definition of "agency," applied to the Office of Science and Technology Policy ("OSTP"), an entity within the Executive Office of the President, because OSTP did not merely "advise and assist the President" but also had an "independent function of evaluating federal programs." *Soucie*, 448 F.2d at 1073-75.

The Supreme Court confirmed that entities that merely "advise and assist the President" are not "agencies" in *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980). There, the Court considered the scope of FOIA, whose definition of "agency" had been amended in 1974 to its current version, which defines agency to "include[] any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (*including the Executive Office of the President*), or any independent regulatory agency." 5 U.S.C. § 552(f)(1) (emphasis added). The Court reasoned that "[t]he legislative history is unambiguous . . . in explaining that the 'Executive Office' does not include the Office of the President" and that Congress did not intend

"agency" to encompass "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." *Kissinger*, 445 U.S. at 156 (quoting H.R. Rep. No. 93-1380, at 15 (1974) (Conf. Rep.)). Indeed, the Conference Report specified that "with respect to the meaning of the term 'Executive Office of the President' the conferees intend[ed] the result reached in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)." H.R. Rep. No. 93-1380, at 14-15; *see Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1040 (D.C. Cir. 1985); *see also Meyer*, 981 F.2d at 1291 n.1 (explaining Congress had codified the D.C. Circuit's analysis of EOP entities in *Soucie* in the 1974 FOIA Amendments).

This approach is rooted in separation of powers concerns. The Supreme Court has recognized that APA review of the President's actions would infringe upon a coordinate branch. *See Franklin*, 505 U.S. at 800-01; *see also Dalton v. Specter*, 511 U.S. 462, 470 (1994); *Detroit Int'l Bridge Co. v. Gov't of Can.*, 883 F. 3d 895, 903-904 (D.C. Cir. 2018) (recognizing separation of powers concerns at issue in seeking judicial review of the President's actions). Such concerns are equally present for entities within the Executive Office of the President that have the sole function of advising and assisting the President, and an exemption from APA review "may be constitutionally required to protect the President's executive powers." *See Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909-10 (D.C. Cir. 1993).

Several cases illustrate the application of the test for whether EOP entities "wield[] substantial authority independently of the President."[5] *Citizens for Resp. & Ethics in Wash.*

---

[5] The D.C. Circuit has used various tests to formulate its inquiry: "These tests have asked, variously, 'whether the entit[ies] exercise[] substantial independent authority,' 'whether . . . the entit[ies]' sole function is to advise and assist the President,' and in an effort to harmonize these tests, 'how close operationally the group is to the President,' 'whether it has a self-contained structure,' and 'the nature of its delegate[d] authority.' However the test has been stated, common to every case in which we have held that an EOP unit is [an agency] . . . has been a

("*CREW*") *v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) (quoting *Sweetland v. Walters*,

60 F.3d 852, 854 (D.C. Cir. 1995)). Specifically, courts have looked to whether EOP entities

have independent regulatory or funding powers or are otherwise imbued with significant

statutory responsibilities. Thus, the D.C. Circuit held OSTP to be an agency because it had

independent authority to initiate, fund, and review research programs and scholarships. *Soucie*,

448 F.2d at 1073-75. Other courts have found the Council for Environmental Quality ("CEQ") to

be an agency because it has the power to issue guidelines and regulations to other federal

agencies, *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980),

and the Office of Management and Budget ("OMB") to be an agency because it has a statutory

duty to prepare the annual federal budget, as well as a Senate-confirmed Director and Deputy

Director. *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978) ("Congress signified the

importance of OMB's power and function, over and above its role as presidential advisor, when

it provided[] . . . for Senate confirmation of the Director and Deputy Director of OMB."), *rev'd

on other grounds*, 442 U.S. 347 (1979).

On the other hand, courts have held that many other EOP entities – including those sued

here – lack such indicia of independent authority. For example, President Reagan's Task Force

on Regulatory Relief, which comprised senior White House staffers and cabinet officials who

headed agencies, was not itself an agency because, while it reviewed proposed rules and

regulations, it could not itself *direct* others to take action. *Meyer*, 981 F.2d at 1294 ("[W]e see no

indication that the Task Force, *qua* Task Force, directed anyone . . . to do anything."). The

Council of Economic Advisors ("CEA") similarly lacks regulatory or funding power, and

---

finding that the entity in question 'wielded substantial authority independently of the President.'"
*CREW*, 566 F.3d at 222-23 (internal citations omitted).

therefore is not an agency. *Rushforth*, 762 F.2d at 1042. Nor is the National Security Council

("NSC") an agency, because it only advises and assists the President in coordinating and

implementing national security policy. *Armstrong v. Exec. Off. of the President*, 90 F.3d 553,

560-61 (D.C. Cir. 1996). The Office of Administration, which provides "operational and

administrative support of the work of the President and his EOP staff," including IT support, is

not an agency, *CREW*, 566 F.3d at 224-25, nor is the Executive Residence Staff, which supports

the President's ceremonial duties, *see Sweetland*, 60 F.3d at 854. The White House Office is

similarly not an agency, *see Sculimbrene v. Reno*, 158 F. Supp. 2d 26, 35-36 (D.D.C. 2001), and

neither is the White House Counsel's Office, *Nat'l Sec. Archive v. Archivist of the U.S.*, 909 F.2d

541, 545 (D.C. Cir. 1990), which is within the White House Office. In short, under this Circuit's

authority, EOP entities that implement binding regulations (CEQ), grant funding (OSTP), or

have important statutorily defined functions (OMB) constitute agencies; those that advise the

President (CEA, Task Force), coordinate policy among different entities (NSC), provide

administrative support for the President's activities (OA, Executive Residence), or constitute his

closest advisors (White House Office) do not.

 Accordingly, none of the Defendants is an "agency" for purposes of the APA. First, it is

well-established that "[t]he actions of the President . . . are not reviewable under the APA

because . . . the President is not an 'agency.'" *Dalton*, 511 U.S. at 470; *Franklin*, 505 U.S. at

800-01. Second, the D.C. Circuit has recognized that the Office of the Vice President is not an

agency. *Meyer*, 981 F.2d at 1295. As the D.C. Circuit reasoned in *Meyer*, Presidents generally

are "reluctant to delegate real supervisory authority over the executive branch to the Vice

President." *Id.* The Vice President may be the Chair of the Coronavirus Task Force, but his

involvement does not confer "agency" status for purposes of the APA. *Id.* at 1295-96. The

remaining Defendants are all close advisors to the President who are not agencies within the meaning of the APA. And although the Plaintiffs have named EOP, generally, as a Defendant in this case, their claims in fact challenge actions solely within the functions of the White House Office. As noted above, the Press Secretary is part of the White House Office, Deere Declaration ¶¶ 1-2, and the White House Office has been held not to be an agency within the scope of the APA. *Sculimbrene v. Reno*, 158 F. Supp. 2d at 36 ("The term 'agency' . . . has been interpreted clearly to exclude the White House Office." (citing *Kissinger*, 445 U.S. at 156; *Nat'l Sec. Archive v. Archivist of the United States*, 909 F.2d 541, 545 (D.C. Cir. 1990)); *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 65 (D.D.C. 2019) ("[B]ecause the Office of the President, also known as the White House Office, has the sole function of advising and assisting the President, the White House Office is not included within FOIA's scope."). Accordingly, Plaintiffs would be unlikely to succeed because they do not have a cause of action against the Defendants under the APA. And even under the APA, the Plaintiffs would not be entitled to the specific mandatory injunctive relief they seek here. *See, e.g., Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (the APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947))).

### C.     Plaintiffs Are Not Likely to Succeed on Their Claim for Mandamus

Plaintiffs are also unlikely to succeed on their claim for mandamus. The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (citation omitted); *see also Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 353 (D.C. Cir. 2007). Mandamus "is hardly ever granted." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005). It is available only if "(1) the plaintiff has a clear

right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (citations omitted). "[T]hose invoking the court's mandamus jurisdiction must have a 'clear and indisputable' right to relief; and even if the plaintiff overcomes all these hurdles, whether mandamus relief should issue is discretionary." *In re Cheney*, 406 F.3d at 729.

Mandamus is not available except to compel a nondiscretionary duty. *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988). "[T]he word 'duty' in § 1361 must be narrowly defined, and . . . a plaintiff's legal grounds supporting the government's duty to him must 'be clear and compelling.'" *In re Cheney*, 406 F.3d at 729 (citation omitted). Indeed, a writ of mandamus may issue only where "the duty to be performed is ministerial and the obligation to act peremptory and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1480 (D.C. Cir. 1995) (citation omitted). A duty is not "ministerial" unless it is "so plainly prescribed as to be free from doubt and equivalent to a positive command. . . . Where the duty is not thus plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." *Consol. Edison Co. of N.Y., Inc. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting *Wilbur v. United States*, 281 U.S. 206, 218-19 (1929)). "[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action." *In re Cheney*, 406 F.3d at 729.

Plaintiffs argue that they have a clear right to "an order compelling Defendants to provide ASL interpretation at all briefings related to the COVID-19 pandemic[,]" Pl.'s Mot. for a Prelim. Inj. & Request for Hearing, at 17, ECF No. 2 ("Pl. Mot."), but that is incorrect. Far from creating

a "clear and indisputable" right to a "plainly prescribed" duty, the Rehabilitation Act's general prohibition of discrimination preserves to federal agencies the discretion to make fact-specific, case-by-case assessments of the reasonableness of the changes requested by disabled individuals. Although "[s]ection 504 unambiguously imposes a duty on federal agencies not to discriminate on the basis of disability in 'any program or activity' they conduct," *Sai*, 149 F. Supp. 3d at 111, the statute neither defines the term agency nor specifically prescribes the manner in which covered agencies fulfill this obligation. *Id.* Thus, EOP's implementing regulation concerning communications, for example, describes its discretion to determine appropriate auxiliary aids to provide effective communication to persons with disabilities without incurring undue burden or fundamentally altering the program or activity. 3 C.F.R. § 102.160. It exercises its own judgment to assess particular requests and balance relevant considerations to make fact-specific determinations about reasonable accommodations on a case-by-case basis.

As has been the case historically for White House press briefings, Deere Declaration ¶¶ 11-12, ASL interpretation has not been provided at briefings. Nevertheless, access to information from the White House coronavirus briefings is available through alternative, non-auditory means. Networks providing live television broadcasts generally are responsible for including closed captioning. Deere Declaration ¶ 13; *see* 47 U.S.C. § 255. In addition, the White House provides through a contractor closed-captioned videos of briefings on the White House pages on YouTube and Facebook. Deere Declaration ¶ 8. Finally, the White House has posted online and distributed to reporters transcripts of all White House Coronavirus Task Force briefings. *Id.* ¶ 14. Given the numerous non-auditory means of access to information from White House coronavirus briefings, Plaintiffs cannot show that the statute clearly and indisputably requires the specific action of providing live, in-frame ASL interpretation for coronavirus briefings. To the contrary,

Plaintiffs' claim for mandamus should be dismissed because Plaintiffs cannot show that they have a clear and indisputable right to an order requiring live, in-frame ASL interpretation at all White House briefings related to the coronavirus pandemic. *In re Cheney*, 406 F.3d at 729.[6]

## II.        The Remaining Factors Do Not Favor Issuance of a Preliminary Injunction

Because Plaintiffs have not sustained their burden to show likelihood of success on the merits, their motion for a preliminary injunction fails. *See, e.g., Sherley*, 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" (quoting *Davis*, 571 F.3d at 1296 (concurring opinion))). No further inquiry is required.

Even if Plaintiffs could show likelihood of success on the merits, the remaining factors – irreparable harm, the balance of the equities, and the public interest – do not favor a preliminary injunction that would immediately require live, televised in-frame ASL interpretation at all briefings that concern coronavirus. *See e.g., Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (The touchstone of irreparable harm is whether "adequate compensatory or other corrective relief will be available at a later date.") (per curiam) (internal quotations omitted); *Nken v. Holder*, 556 U.S. 418, 435 (2009) (Where the government is a party, the final two elements of the preliminary injunction standard tend to merge.). Plaintiffs request broad relief that would immediately require "live televised in-frame ASL interpretations at all public briefings conducted by any Defendant that address issues concerning COVID-19, including all such briefings involving President Trump, Vice President Pence, Press Secretary McEnany, or

---

[6] Because plaintiffs rely exclusively on Section 504 and mandamus to support their preliminary injunction bid, there is no need to address the other two claims in the complaint, for violation of the First Amendment and for nonstatutory review. Pl. Mot. at 17 & n.16. In any event, plaintiffs have not sustained their burden to show likelihood of success on the merits with respect to either of these claims.

any members of the White House Coronavirus Task Force." Pls.' Proposed Order, ECF No. 2-2. As written, this relief is exceedingly broad. As an example, "address[ing] issues concerning COVID-19" would implicate instances where press briefings are announced and intended to focus on subjects other than coronavirus, but where a reporter asks a question either directly about or concerning coronavirus. Such a situation would clearly be outside of Defendants' control yet covered by Plaintiffs' proposed order.

Even putting aside the broad scope of Plaintiffs' requested relief, to Defendants' knowledge, such a requirement would be new at the White House, where live ASL interpretation has not been provided during public briefings in any recent Administration, even during prior times of national emergency or significant events that, in some cases, endure for several years (e.g., military operations in Iraq). Deere Declaration ¶¶ 11-12. As noted, the information presented during press briefings is presented in alternative, non-auditory formats, including live, closed-captioning, *see* 47 U.S.C. § 255; Deere Declaration ¶ 13; captioned video uploads to YouTube and Facebook, Deere Declaration ¶ 8; and online posting of transcripts and distribution of transcripts to reporters, Deere Declaration ¶ 14. And to the extent Plaintiffs allege that they lack access to the Internet or face other similar barriers but acknowledge that the White House has provided non-auditory means for accessing the content of the press briefings, *cf.* Strail Declaration ¶ 3, those particular barriers alleged by Plaintiffs are not disabilities within the terms of the relief authorized by the Rehabilitation Act, which addresses certain physical and mental impairments, *see* 29 U.S.C. §§ 794(a), 705(20). Therefore, those obstacles do not provide support for the broad, mandatory injunctive relief that Plaintiffs seek here.

The broad relief that Plaintiffs seek does not satisfy the requirement that a preliminary injunction be "tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct.

1916, 1934 (2018). In light of the historical practice across multiple Administrations regarding White House press briefings in general, *see* Deere Declaration ¶¶ 11-12, Plaintiffs have not shown the basis for an injunction that would require live, in-frame ASL interpreter services for all White House press briefings.

## CONCLUSION

For the foregoing reasons, Defendants' respectfully request that the Court deny the Plaintiffs' Motion for Preliminary Injunction.

Dated: August 14, 2020                    Respectfully submitted,


ETHAN P. DAVIS
Acting Assistant Attorney General


DAVID M. MORRELL
Deputy Assistant Attorney General


JENNIFER D. RICKETTS
Branch Director
Federal Programs Branch


CARLOTTA P. WELLS
Assistant Branch Director
Federal Programs Branch


  /s/ Amber Richer
AMBER RICHER (CA Bar No. 253918)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 514-3489
Email: amber.richer@usdoj.gov

*Attorneys for Defendants*

24

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2020, I electronically transmitted the foregoing to the parties and the clerk of court for the United States District Court for the District of Columbia using the CM/ECF filing system.

 /s/ Amber Richer
AMBER RICHER (CA Bar No. 253918)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 514-3489
Email: amber.richer@usdoj.gov