# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF THE DEAF, *et al.*,

       *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

       *Defendants*.

Civil Action No. 20-cv-2107

# REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR REHABILITATION
        ACT CLAIM ......................................................................................................... 2

        A.      The Rehabilitation Act Provides a Private Right of Action for Declaratory
                and Injunctive Relief Against Executive Agencies ................................................. 2

                1.      Section 504's Text, Structure, and History Support a Private Right
                        of Action ............................................................................................ 3

                2.      Courts Have Repeatedly Held That the Rehabilitation Act Provides
                        a Private Right of Action ...................................................................... 7

                3.      Defendants' Arguments Are Unavailing .................................................. 10

                        a.      Defendants' Cases Are Distinguishable ............................................ 10

                        b.      Defendants' Textual Arguments Fail ................................................ 13

        B.      Plaintiffs May Also Pursue Their Rehabilitation Act Claim in Equity ................. 17

        C.      Defendants Have Violated the Rehabilitation Act ................................................. 18

II.     ALTERNATIVELY, PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR
        CLAIM FOR MANDAMUS ................................................................................. 22

III.    PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IF A
        PRELIMINARY INJUNCTION IS NOT GRANTED ......................................... 23

IV.     THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH
        HEAVILY IN FAVOR OF PLAINTIFFS ........................................................... 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

Page

**<u>Cases</u>**

*13th Reg'l Corp. v. U.S. Dep't of Interior*,
    654 F.2d 758 (D.C. Cir. 1980) ........................................................................22, 23

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)....................................................................................... *passim*

*Am. Council of Blind v. Astrue*,
    No. C 05-04696 WHA, 2008 WL 1858928 (N.D. Cal. Apr. 23, 2008)....................9

*Am. Council of the Blind v. Paulson*,
    525 F.3d 1256 (D.C. Cir. 2008) ..............................................................................8

*American Council of Blind v. Paulson*,
    463 F. Supp. 2d 51 (D.D.C. 2006) ........................................................8, 12, 14, 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)...............................................................................................17

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979)..................................................................................... *passim*

*Clark v. Skinner*,
    937 F.2d 123 (4th Cir. 1991) ...................................................................10, 11, 12

*Cort v. Ash*,
    422 U.S. 66 (1975)........................................................................................3, 6, 7

*Cousins v. Secretary of the U.S. Dep't of Transp.*,
    880 F.2d 603 (1st Cir. 1989)....................................................................10, 11, 12

*Davis v. Astrue*,
    Nos. C-06-6108, C-09-0988, 2011 WL 3651064 (N.D. Cal. Aug. 18, 2011) ..........9

*Disabled in Action v. Pierce*,
    606 F. Supp. 310 (E.D. Pa. 1985) ..........................................................................9

*Doe v. Attorney General*,
    941 F.2d 780 (9th Cir. 1991) ....................................................................... *passim*

*Doe v. District of Columbia*,
    796 F. Supp. 559 (D.D.C. 1992)..............................................................................7

*El Paso Nat. Gas Co. v. United States*,
    750 F.3d 863 (D.C. Cir. 2014) .................................................................................3

*Fornaro v. James*,
    416 F.3d 63 (D.C. Cir. 2005) ........................................................................................22

*Freedom Watch, Inc. v. Obama*,
    807 F. Supp. 2d 28 (D.D.C. 2011) ................................................................................22

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988) ........................................................................................................6

*Howard v. Bureau of Prisons*,
    No 3:05-CV-1372, 2008 WL 318387 (M.D. Pa. Feb. 4, 2008) ......................................9

*In re Cheney*,
    406 F.3d 723 (D.C. Cir. 2005) ......................................................................................23

*J.L. v. Soc. Sec. Admin.*,
    971 F.2d 260 (9th Cir. 1992) .......................................................................................8, 9

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*,
    219 F. Supp. 2d 20 (D.D.C. 2002) ................................................................................22

*Kinneary v. City of N.Y.*,
    358 F. Supp. 2d 356 (S.D.N.Y. 2005) ......................................................................10, 11

*Kling v. Los Angeles Cty.*,
    633 F.2d 876 (9th Cir. 1980) ...........................................................................................3

*Lane v. Pena*,
    518 U.S. 187 (1996) ............................................................................................... *passim*

*Lane v. Pena*,
    867 F. Supp. 1050 (D.D.C. 1994) ...................................................................................7

*Lee v. U.S. Agency for Int'l Dev.*,
    859 F.3d 74 (D.C. Cir. 2017) ..........................................................................................3

*Majocha v. Turner*,
    166 F. Supp. 2d 316 (W.D. Pa. 2001) ...........................................................................21

*Martinez v. Cuomo*,
    No. 20-CV-3338 (VEC), 2020 WL 2393285 (S.D.N.Y. May 12, 2020) ...................2, 21

*McBride v. Mich. Dep't of Corr.*,
    294 F. Supp. 3d 695 (E.D. Mich. 2018) ........................................................................21

*McRaniels v. U.S. Dep't of Veterans Affairs*,
    15-cv-802, 2017 WL 2259622 (W.D. Wis. May 19, 2017) .......................................9, 11

*Mendez v. Gearan*,
    947 F. Supp. 1364 (N.D. Cal. 1996) ...............................................................................9

*Muhammad v. United States,*
    300 F. Supp. 3d 257 (D.D.C. 2018) ...................................................................15

*Nat'l Parks Conservation Ass'n v. Semonite,*
    282 F. Supp. 3d 284 (D.D.C. 2017) ...................................................................24

*Pierce v. District of Columbia,*
    128 F. Supp. 3d 250 (D.D.C. 2015) .....................................................................7

*Sai v. Dep't of Homeland Sec.,*
    149 F. Supp. 3d 99 (D.D.C. 2015) ............................................................ *passim*

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ...........................................................................23

*United States v. Wilson,*
    290 F.3d 347 (D.C. Cir. 2002) .............................................................................6

*Washington v. Fed. Bureau of Prisons,*
    No. 5:16-cv-03913, 2019 WL 2125246 (D.S.C. Jan. 3, 2019) .............................9

*Yeh v. U.S. Bureau of Prisons,*
    No. 3:18-CV-943, 2019 WL 3713874 (M.D. Pa. May 15, 2019)...........................9

*Yeh v. U.S. Bureau of Prisons,*
    No. 3:18-CV-943, 2020 WL 1505661 (M.D. Pa. Mar. 30, 2020) ........................14

## Statutes

20 U.S.C. § 1681 ....................................................................................................4

29 U.S.C. § 794 ............................................................................................ *passim*

29 U.S.C. § 794a .......................................................................................... *passim*

29 U.S.C. § 794d ..................................................................................................16

42 U.S.C. § 2000d ..................................................................................................4

42 U.S.C. § 2000d–1 ............................................................................................14

## Other Authorities

3 C.F.R. § 102.160 .....................................................................................18, 22, 23

3 C.F.R. § 102.170 ................................................................................................15

S. Rep. No. 93-1297, 1974 U.S.C.C.A.N. 6373 .....................................................4

Jo Anne Simon, *The Use of Interpreters for the Deaf and the Legal Community's
    Obligation to Comply With the A.D.A.*, 8 J.L. & Health 155 (1994) ......................................20

Lauren Oberhein*, Selective Hearing: Communication Barriers in the Court
    System for Deaf and Hard-of-Hearing Victims of Rape or Sexual Assault*, 25
    Wm. & Mary J. Race, Gender & Soc. Just. 163 (2018).........................................................20

Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness,
    Language, and Due Process*, 844 Wis. L. Rev 843 (2003) ....................................................20

## INTRODUCTION

Defendants assert that the White House has "worked diligently" to provide the general public with "*access* to important public health information" during this worldwide pandemic. *See* Defendants' Opposition to Motion for Preliminary Injunction (Dkt. No. 9) ("Opp.") 1 (emphasis added).  In reality, however, Defendants are *refusing* to provide such access to Plaintiffs and the hundreds of thousands of other deaf persons who rely on ASL to communicate.

According to Defendants, closed-captioning and written transcripts are enough.  That is wrong.  Defendants assume—with no factual support whatsoever—that all deaf persons can read and understand written English versions of White House coronavirus briefings.  But Plaintiffs' unrebutted evidence demonstrates that English and ASL are different languages and thus, for many deaf persons, English is a foreign language, especially for complex topics like the coronavirus.  Closed captions and after-the-fact transcripts written in a foreign language do not provide such persons with meaningful access to the briefings.  ASL interpretation is required.

Defendants dedicate most of their brief to arguing that the Rehabilitation Act does not provide Plaintiffs with a private right of action.  That too is wrong, and is contrary to the plain language of the statute and multiple decisions of this Court and other courts across the country. Defendants also argue they are immune from suit under the Administrative Procedure Act, even though Plaintiffs have not even asserted such a claim here.  According to Defendants, then, even if the White House intentionally discriminates against people with disabilities, the victims would have *no judicial recourse whatsoever*—they could not pursue claims under the Rehabilitation Act *or* the APA.  That position is extreme and unwarranted, and far beyond what Congress intended when it amended the Rehabilitation Act for the specific purpose of prohibiting discrimination by Executive agencies.  The White House is not above the law.

Defendants' brief is also remarkable for what it does not address.  Defendants do not dispute—and thus concede—that Plaintiffs are likely to suffer irreparable harm in the absence of an injunction.  This alone must tilt the scale strongly in favor of granting an injunction.  Additionally, Defendants do not dispute—and thus concede—that providing ASL interpreters during press briefings is administratively feasible and relatively inexpensive, which is confirmed by the fact that all 50 states' governors have done it.

Finally, Defendants ignore the directly on-point decision of *Martinez v. Cuomo*, in which the court ordered New York's Governor Cuomo to provide in-frame ASL interpreters at each of his coronavirus briefings.  The court's words ring equally true as applied to President Trump:

> The [President] has not explained why he resisted Plaintiffs' [and others'] pre-litigation pleas for him to implement in-frame ASL interpretation.  His position in this litigation comes down to his view that the law does not require it; he has done other things to accommodate the deaf, and therefore, he will not provide in-frame ASL interpretation.  That dismissive attitude towards this segment of his constituency—beyond being unkind—runs counter to the law of the land as articulated in the ADA and RA [Rehabilitation Act].

No. 20-CV-3338 (VEC), 2020 WL 2393285, at *6 n.7 (S.D.N.Y. May 12, 2020).

This Court should follow the well-reasoned decision in *Martinez* and likewise order Defendants to provide in-frame ASL interpreters at all White House coronavirus briefings.

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR REHABILITATION ACT CLAIM

### A.   The Rehabilitation Act Provides a Private Right of Action for Declaratory and Injunctive Relief Against Executive Agencies

Defendants argue that Plaintiffs lack a private right of action under the Rehabilitation Act to seek declaratory and injunctive relief against Executive agencies.  Opp. 11-14.  Defendants are wrong.

To determine whether a statute provides a private right of action, the Court "interpret[s] the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "Statutory intent . . . is determinative." *Id.* The Court's inquiry "begins with the text and structure of the statute." *Lee v. U.S. Agency for Int'l Dev.*, 859 F.3d 74, 77 (D.C. Cir. 2017). The Court also considers the four factors enumerated in *Cort v. Ash*, 422 U.S. 66 (1975): whether (1) the plaintiff is one of the class for whose benefit the statute was enacted; (2) some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law. *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 889 (D.C. Cir. 2014).

      1.    <u>Section 504's Text, Structure, and History Support a Private Right of Action</u>

Congress enacted section 504 as part of the Rehabilitation Act of 1973.  As originally enacted, section 504 provided:

> No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 394 (1973) (current version at 29 U.S.C. § 794(a)).

Congress modeled the text of section 504 on the language of section 601 of Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or

national origin.[1]  *Kling v. Los Angeles Cty.*, 633 F.2d 876, 878 (9th Cir. 1980); S. Rep. No. 93-

1297 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6373, 6390 ("Section 504 was patterned after,

and is almost identical to, the anti-discrimination language of section 601 . . . .").  The text of

section 504 also mirrors the language of section 901 of Title IX of the Education Amendments of

1972, which prohibits discrimination on the basis of sex and was also modeled on section 601.[2]

The Supreme Court has held that these nearly identical provisions of Title VI and Title

IX create private rights of action.  *Sandoval*, 532 U.S. at 279 ("[P]rivate individuals may sue to

enforce § 601 of Title VI and obtain both injunctive relief and damages."); *Cannon v. Univ. of

Chicago*, 441 U.S. 677, 681–709 (1979) (holding that private right of action exists to enforce

Title IX).  In so doing, the Court emphasized that the rights-creating language of the statute—

"No person . . . shall . . . be subjected to discrimination . . . ."—was "the most accurate indicator

of the propriety of implication of a cause of action."  *Cannon*, 441 U.S. at 689–90 & n.13.  The

Court also found it significant that Congress had modeled section 901 after section 601 of Title

VI, and, at the time section 901 was enacted in 1972, "at least a dozen" courts had uniformly

interpreted section 601 as providing for a private right of action.  *Id.* at 694–703.  Congress, the

Court held, was presumed to have known about these judicial decisions when it enacted section

901 in 1972.  *Id.* at 696–97.  The "persistence—before 1972 and since, among judges . . . and

even implicit in decisions of th[e] Court—of the assumption that both Title VI and Title IX

---

[1]   Section 601 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

[2]   Section 901 provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

created a private right of action" left "no doubt" in the Court's mind that Congress intended to create a private right of action in section 901.  *Id.* at 702–03.

Section 504 of the Rehabilitation Act has always contained the exact same "rights-creating language" that the Supreme Court held was "critical" to implying private rights of action in sections 601 and 901.  *Sandoval*, 532 U.S. at 288.  "Except for the substitution of the word ['disability'] in [section 504] to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited class."  *Cannon*, 441 U.S. at 694–95. It would be completely anomalous to conclude that Congress, through its use of the same language in each of these statutes, intended to create a private right of action in section 601 (in 1964) and section 901 (in 1972) but not in section 504 (in 1973).  As such, by 1978, several courts had already held that section 504 provided for a private right of action.  *See Doe v. Attorney General*, 941 F.2d 780, 786 (9th Cir. 1991) (collecting cases).

In 1978, Congress expanded the Rehabilitation Act.  As originally drafted, section 504 prohibited disability discrimination only by recipients of federal funds, not by federal government agencies themselves.  In 1978, Congress added the following language to the statute to make it apply directly to federal agencies—". . . or under any program or activity conducted by any Executive agency or by the United States Postal Service."  Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602, 92 Stat. 2955 (1978).  The purpose of this amendment was to "extend and strengthen" the 1973 provision, "close th[is] loophole," and "subject[] federal agencies to section 504's nondiscrimination requirement."  *Doe*, 941 F.2d at 785–86 (collecting legislative history). Importantly, "[t]he congressional debate on the amendment[] demonstrate[d] that Congress knew that the courts had interpreted section 504 to provide [a] means of enforcement" through a

private right of action.  *Id*. at 786 (collecting legislative history).  Congress also encouraged

private enforcement by adding an attorneys' fees provision in section 505(b).  *See* 29 U.S.C.

§ 794a(b).

Accordingly, section 504's text, structure, and history demonstrate that Congress

intended section 504, just like the sections of Title VI and IX on which it was based, to provide a

private right of action to enforce its terms through declaratory and injunctive relief.

In addition, all four *Cort* factors support the conclusion that Congress intended to create a

private right of action under section 504.

*First*, there can be no dispute that Plaintiffs are part of "the class for whose [special]

benefit the statute was enacted."  *Cort*, 422 U.S. at 78.  Just as section 901 "explicitly confers a

benefit on persons discriminated against on the basis of sex," *Cannon*, 441 U.S. at 694, section

504 confers a benefit on persons discriminated against by reason of disability.  "Unquestionably,

therefore, the first of the four factors . . . favors the implication of a private cause of action."  *Id.*

at 693–94.

*Second*, as explained above, there is clear indication in the text and history of section 504

"of legislative intent . . . to create . . . a remedy."  *Cort*, 422 U.S. at 78.  Just like section 901 of

Title IX, section 504 was patterned after section 601 of Title VI, which courts had uniformly

interpreted to provide for a private right of action before passage of the Rehabilitation Act of

1973.  *See Cannon*, 441 U.S. at 694–703.  Congress is presumed to have been knowledgeable

about this existing law when it enacted the Rehabilitation Act.  *See Goodyear Atomic Corp. v.*

*Miller*, 486 U.S. 174, 185 (1988); *United States v. Wilson*, 290 F.3d 347, 357 (D.C. Cir. 2002).

Thus, just as in *Cannon*, there is evidence of legislative intent to create a private right of action.

*Third*, implying a private right of action is "consistent with the underlying purposes of the legislative scheme." *Cort*, 422 U.S. at 78.  As in *Cannon*, implying a private right of action is consistent with the underlying purpose of the legislative scheme to "provide individual citizens effective protection against [discriminatory] practices." *Cannon*, 441 U.S. at 704.  The award of individual relief to a private litigant is "fully consistent with—and in some cases even necessary to—the orderly enforcement of the statute." *Id.* at 705–06.

*Fourth*, implying a federal remedy would not be inappropriate because the subject matter does not involve "an area basically the concern of the States." *Cort*, 422 U.S. at 78.  "Since the Civil War," it has been "the Federal Government and the federal courts" who have been the "primary and powerful reliances in protecting citizens against such discrimination." *Cannon*, 441 U.S. at 708 (internal quotation marks omitted).  And while the Americans with Disabilities Act prohibits discrimination by the states, it is the Rehabilitation Act that applies to the executive branch. *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 266 n.10 (D.D.C. 2015).

> 2.    Courts Have Repeatedly Held That the Rehabilitation Act Provides a
>        Private Right of Action

Against this backdrop, numerous courts—including this one—have held that section 504 provides plaintiffs with a private right of action under section 504 to pursue injunctive and declaratory relief against Executive agencies.

In *Lane v. Pena*, 867 F. Supp. 1050 (D.D.C. 1994), a student in the U.S. Merchant Marine Academy sued the Department of Transportation ("DOT") for violating the Rehabilitation Act after he was separated from the Academy on the ground that his diabetes was a "disqualifying condition." *Id.* at 1054–55.  The plaintiff sought an injunction reinstating him to the Academy as well as compensatory damages. *Id.* at 1052.  As to plaintiff's claim for injunctive relief against the DOT, a federal agency, this Court recognized that it was "well-

established that injunctive and declaratory relief are available under the Rehabilitation Act." *Id.*

at 1073 (quoting *Doe v. District of Columbia*, 796 F. Supp. 559, 573 (D.D.C. 1992)).  This Court

also initially awarded compensatory damages, but later vacated that portion of its order.  *See*

*Lane v. Pena*, 518 U.S. 187, 190 (1996).  After further appeals, the Supreme Court held that the

Rehabilitation Act did not waive the federal government's sovereign immunity for money

damages claims against federal agencies for violations of section 504.  *Id*. at 192.  Thus, under

*Lane*, Rehabilitation Act claims seeking *monetary relief* against Executive agencies are

unavailable.  However, the injunctive relief that was awarded by this Court was not challenged

by the government on appeal and was not disturbed by the Supreme Court.  *Id.* at 190.

Following *Lane*, this Court again recognized a private right of action to pursue

declaratory and injunctive relief against Executive agencies in *American Council of the Blind v.*

*Paulson*, 463 F. Supp. 2d 51 (D.D.C. 2006).  In *Paulson*, a national advocacy group for the blind

brought suit under section 504 to compel the Department of Treasury to issue paper currency that

was distinguishable by blind and visually impaired people.  *Id.* at 52.  The government moved to

dismiss, arguing that, under *Lane*, the United States enjoyed sovereign immunity against claims

brought under section 504.  *Id.* at 57.  But the Court disagreed, noting that "[i]njunctive relief

was awarded by the district court in *Lane*, was not challenged by the government, and was not

disturbed by the Supreme Court."  *Id.* at 58.  On the merits, the Court found in favor of Plaintiffs,

declaring that Treasury had violated section 504, and ordering further proceedings to address an

appropriate injunction.  *Id.* at 62–63.  The government appealed the Court's declaratory

judgment but—again—did not challenge plaintiff's right to bring a claim for declaratory and

injunctive relief under section 504.  *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1259

(D.C. Cir. 2008).  The D.C. Circuit affirmed.  *Id.* at 1274.

Courts across the country likewise have held that section 504 provides a private right of action to seek declaratory and injunctive relief against Executive agencies.  *See, e.g.*, *J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 264 (9th Cir. 1992); *Doe*, 941 F.2d at 785–95[3]; *Yeh v. U.S. Bureau of Prisons*, No. 3:18-CV-943, 2019 WL 3713874, at *5 (M.D. Pa. May 15, 2019) ("[T]he Court of Appeals and courts in this district have held that a plaintiff may bring a claim for injunctive relief under section 504(a) of the [Rehabilitation Act] against agencies and individuals acting in their official capacities."); *Washington v. Fed. Bureau of Prisons*, No. 5:16-cv-03913, 2019 WL 2125246, at *8 (D.S.C. Jan. 3, 2019) ("Numerous courts have considered . . . claims [under section 504] without reference to any jurisdictional problems."); *McRaniels v. U.S. Dep't of Veterans Affairs*, 15-cv-802, 2017 WL 2259622, at *4 (W.D. Wis. May 19, 2017) ("[R]eading sections 504 and 505 [of the Rehabilitation Act] together compels a finding of an implied private right of action."); *Davis*, 2011 WL 3651064, at *5 ("there is a private right of action under § 504" for declaratory and injunctive relief against Executive agencies); *Am. Council of the Blind v. Astrue*, No. C 05-04696 WHA, 2008 WL 1858928, at *7 (N.D. Cal. Apr. 23, 2008) (holding that section 504 provided private right of action for declaratory and injunctive relief against Executive agencies); *Howard v. Bureau of Prisons*, No 3:05-CV-1372, 2008 WL 318387, at *9 (M.D. Pa. Feb. 4, 2008) ("With regard to the Rehabilitation Act . . . , injunctive relief is available even though damages are not."); *Mendez v. Gearan*, 947 F. Supp. 1364, 1366 (N.D. Cal. 1996) (recognizing "private right of action established under § 504(a)" for equitable remedies);

---

[3]    *J.L.* and *Doe* were overruled in part by *Lane*'s holding that the Rehabilitation Act does not waive sovereign immunity for *damages* claims against Executive agencies.  But *Lane* did not address whether the Act allows plaintiffs to pursue claims for injunctive or declaratory relief, and *J.L.* and *Doe* remain good law on that issue.  *See Davis v. Astrue*, Nos. C-06-6108, C-09-0988, 2011 WL 3651064, at *3 (N.D. Cal. Aug. 18, 2011).

*Disabled in Action v. Pierce*, 606 F. Supp. 310, 314 (E.D. Pa. 1985) ("[Section] 504 was intended by Congress to be an independent weapon in its barrier-free arsenal").

        3.    <u>Defendants' Arguments Are Unavailing</u>

        a.    *Defendants' Cases Are Distinguishable*

Defendants cite a handful of cases for the proposition that the Rehabilitation Act does not provide a private right of action against Executive agencies, even for declaratory and injunctive relief. *See* Opp. 11 & n.2 (citing *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603 (1st Cir. 1989); *Clark v. Skinner*, 937 F.2d 123 (4th Cir. 1991); *Sai v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99 (D.D.C. 2015); *Kinneary v. City of N.Y.*, 358 F. Supp. 2d 356 (S.D.N.Y. 2005)). But those decisions are distinguishable on several grounds and do not foreclose finding a private right of action here.

Each of the cases cited involved actions challenging the government in its capacity as a *regulator*. The cases held that plaintiffs' *regulatory* challenges should have been brought under the Administrative Procedure Act ("APA") rather than the Rehabilitation Act. None of these cases hold that where, as here, plaintiffs are challenging a government agency "as proprietary discriminator" in the way it conducts programs or activities, plaintiffs lack a cause of action under the Rehabilitation Act. *See Doe*, 941 F.2d at 793–94 (distinguishing *Cousins* on this basis); *Washington*, 2019 WL 2125246, at *8 (same).

In *Cousins*, a deaf truck driver challenged a DOT *regulation* requiring a minimum level of hearing for truck drivers on the ground that the regulation violated the Rehabilitation Act. 880 F.2d at 604. In holding that plaintiff should have brought his claim under the APA, the court noted that the Rehabilitation Act was "silent about whether and how a person injured by the government *as regulator* is to enforce the Act against the government." *Id.* at 605 (emphasis in original). Importantly, the court's reasoning turned on the fact that the APA provided a remedy

for plaintiff's claims.  *Id.* at 606.  ("[I]n light of the existence of the APA, it rarely makes sense to find that a substantive statute creates an 'implied private right of action' against the federal government for relief from unlawful regulatory action.").

Similarly, in *Clark*, the plaintiff, a truck driver whose left arm was amputated, challenged a Federal Highway Administration regulation prohibiting amputees from driving commercial vehicles without a waiver.  937 F.2d at 124.  The court, following *Cousins*, held that plaintiff must pursue his challenge to the regulation under the APA because he was pursuing a claim "against the United States government *in its capacity as a regulator*."  *Id.* at 125 (emphasis added).  Again, the court was not addressing a substantive claim of discrimination against an executive agency. *Id.*; *see also Kinneary*, 358 F. Supp. 2d at 360 (holding "there is no implied private right of action in the Rehabilitation Act against the United States *when acting as a regulator*" (emphasis added)).

In *Sai*, the plaintiff, proceeding *pro se*, had filed an administrative complaint with the Department of Homeland Security ("DHS") alleging that he was harassed and mistreated on the basis of his disability during two incidents at airport security checkpoints.  149 F. Supp. 3d at 104. After DHS failed to respond to plaintiff's administrative complaint within the time period prescribed by governing regulations, plaintiff brought suit against DHS and others, asserting claims under the Rehabilitation Act and APA for failure to respond to his complaint.  *Id.*  In assessing plaintiff's Rehabilitation Act claim, the Court held that plaintiff did not have a cause of action "to remedy DHS's failure to respond to the . . . complaint in a timely manner" because "[t]he Rehabilitation Act says nothing about the processing or consideration of administrative complaints."  *Id.* at 112.  The Court's holding in *Sai* did not address whether plaintiff could state a claim against DHS as proprietary discriminator, because plaintiff had not even brought such a claim.  *Id.* at 104; *McRaniels*, 2017 WL 2259622, at *4 (distinguishing *Sai* on this basis).

Significantly, the government argued in *Sai* that the Rehabilitation Act *would* provide the plaintiff an adequate remedy if he had pursued a substantive discrimination claim because, in the government's view, "***Section 504 implies a private right of action to sue for injunctive relief in federal court for violations of that section***."  Gov't Reply at 6, No. 14-1876 (D.D.C. Aug. 27, 2015), Dkt. No. 77 (emphasis added) (citing *Paulson*, 463 F. Supp. 2d at 58).[4]  Here, the government take the opposite view, arguing section 504 implies no right of action.  They were right the first time.

Finally, even if the Court were to conclude that *Cousins*, *Clark*, and *Sai* addressed substantive claims for discrimination of the kind Plaintiffs are pursuing here—they did not—those cases would still be distinguishable on an even more fundamental basis:  in each decision, the plaintiff had another path to pursue judicial relief in the APA.  *See Cousins*, 880 F.2d at 605; *Clark*, 937 F.2d at 125–26; *Sai*, 149 F. Supp. 3d at 115.  Accordingly, holding that the Rehabilitation Act did not provide a provide right of action did not close the courthouse doors to the plaintiffs; it merely pointed to the APA as a more appropriate avenue for seeking relief.  Here, by contrast, Defendants are asserting that neither the Rehabilitation Act *nor the APA* provide a remedy, and thus Plaintiffs have no legal recourse whatsoever for any disability discrimination perpetrated by Defendants.  Opp. 14–19.  Not only is this position inconsistent with the government's position taken in *Sai*, it is untenable.  Indeed, if the Court were to accept it, the Executive Office of the President and all of its subsidiary agencies could theoretically engage in

---

[4]    The Court also dismissed plaintiff's APA claim insofar as it purported to assert a substantive claim of discrimination, as plaintiff's complaint "merely challenge[d] the failure of Defendants to respond to his administrative complaint in a timely manner."  149 F. Supp. 3d at 115.  In *dictum*, the Court also stated—contrary to the government's argument and without the benefit of adversarial briefing from counsel for the plaintiff (who was proceeding *pro se*)—that such a claim "arises under the APA," citing *Cousins* and *Clark*.  As explained, however, those decisions involved *regulatory* challenges to agency action not substantive claims of discrimination.

all manner of unlawful discrimination in violation of the Rehabilitation Act with the victims having no ability to sue to enjoin such misconduct.  This is not the law and not what Congress had in mind when it *expanded* the Rehabilitation Act in 1978 to apply to Executive agencies.

b.   *Defendants' Textual Arguments Fail*

Defendants also make several strained textual arguments in an attempt to avoid the plain language and structure of the Rehabilitation Act.  None are correct.

First, Defendants argue that the Rehabilitation Act does not provide a private right of action against Executive agencies for declaratory or injunctive relief because the "remedies" provision of section 505(a)(2) "authorizes remedies only against federal agencies providing federal assistance," and not against federal agencies "conduct[ing] their own programs or activities."  Opp. 11-13 (citing *Lane v. Pena*, 518 U.S. 187 (1996)).  Not so.  As explained above, the right of action arises under the plain text of *section 504*—"No otherwise qualified individual with a disability . . . shall . . . be subjected to discrimination"—not section 505.  Just because Congress allowed for *additional* remedies to be asserted against recipients and providers of federal funds does not mean that—by negative inference—Congress intended to bar all claims against Executive agencies that discriminate in their own right.

While the Court in *Lane* considered the remedies provision of section 505(a)(2), it did so for a very different purpose—namely, to determine whether that provision abrogated the government's sovereign immunity against claims for *monetary* damages.  The standard for that determination is whether Congress "clearly," "unambiguously," and "expressly" waived the government's immunity for such claims.  518 U.S. at 192–93; *id.* at 192 ("A waiver of the Federal Government's sovereign immunity must be *unequivocally expressed* in statutory text, and *will not be implied*." (emphasis added) (citations omitted)).  Here, by contrast, the issue is whether Congress created an *implied* private right of action against Executive agencies for

13

claims seeking only declaratory and injunctive relief. That issue was not addressed in *Lane*. *See Paulson*, 463 F. Supp. 2d at 58 ("Injunctive relief was awarded by the district court in *Lane*, was not challenged by the government, and was not disturbed by the Supreme Court."). An implied private right of action, by definition, will never be express. *See Cannon*, 441 U.S. at 694–96. Rather, the Court's inquiry turns on other indicia of statutory intent to determine whether Congress intended to create a private remedy, notwithstanding the lack of an express remedy in the statute. *Sandoval*, 532 U.S. at 286.

As explained above, section 504's text, structure, and history all point to an intent to create a private remedy in this context. The fact that Congress extended Title VI remedies to victims of discrimination by recipients and providers of federal funds in section 505(a)(2) does not suggest otherwise. Indeed, it would not have made sense for Congress to extend all Title VI remedies to section 504 claims against Executive agencies, as at least one of those remedies—the withdrawal of funding for continuing violations, *see* 42 U.S.C. § 2000d–1—could not apply to an Executive agency. Moreover, at the same time that Congress added section 505(a)(2) in 1978, Congress added an attorneys' fees provision in section 505(b) that allows prevailing plaintiffs to recover fees in "*any* action or proceeding" to enforce section 504, including those pursued directly against Executive agencies. 29 U.S.C. § 794a(b) (emphasis added); *see, e.g.*, *Yeh v. U.S. Bureau of Prisons*, No. 3:18-CV-943, 2020 WL 1505661, at *10 (M.D. Pa. Mar. 30, 2020) (ordering Executive agency to pay attorneys' fees under § 794a(b) in suit for injunctive relief).

Second, Defendants argue that section 504 cannot itself support a private right of action because "[a]s in *Sandoval*," section 504 "lacks the necessary 'rights-creating language'" to imply a private right of action. Opp. 12 (quoting *Sandoval*, 532 U.S. at 288–89). To the contrary, section 504 contains *exactly* the same rights-creating language—"[n]o person . . . shall . . . be

subjected to discrimination"—that the Court in *Sandoval* held was "so critical to the Court's analysis" in concluding that section 601 of Title VI and section 901 of Title IX provided for a private right of action.  532 U.S. at 288–89.  Additionally, the issue in *Sandoval* was whether Congress created a private right of action to enforce a statute authorizing federal agencies to promulgate *regulations*—not a statute like section 504, which itself prohibits discrimination using the same language of sections 601 and 901.

Third, Defendants suggest that, because Congress directed Executive agencies to promulgate regulations to "carry out" the substantive provisions of section 504, this somehow demonstrates that Congress did *not* intend to imply a private right of action to enforce section 504.  Opp. 13.  This is wrong.  When Congress expanded section 504 in 1978 to make it applicable to Executive agencies, it also added this sentence:  "The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the [the 1978 Act]."  29 U.S.C. § 794(a).  Nothing in the statutory text or legislative history suggests a congressional intent to *deny* plaintiffs a private right of action or restrict plaintiffs solely to an "administrative" remedy.  Opp. 13.  Indeed, "[c]ourts have uniformly held that non-federal employees . . . need not exhaust administrative remedies before bringing a private action under Section 504 of the Rehabilitation Act."  *Muhammad v. United States*, 300 F. Supp. 3d 257, 263 (D.D.C. 2018).  Rather, the administrative complaint procedure that EOP established after 1978 is an optional, nonjudicial process that individuals may or may not elect to pursue.  *See* 3 C.F.R. § 102.170.  Moreover, that process involves review and decision by the agencies themselves, who could be the alleged discriminators in such claims.  3 C.F.R. § 102.170(g), (j).  The regulations do not provide for any review by a court of the agency's decision and, according to Defendants, even APA review of the agency's decision would be unavailable.  Opp. 14–19.

Without an opportunity to seek any review before a neutral adjudicator—a court—such a process cannot adequately ensure compliance with section 504.

Fourth and finally, Defendants argue that Congress "reiterated" that the remedy for section 504 violations is administrative in the course of amending a separate provision of the Rehabilitation Act (section 508) that addresses making electronic and information technology available to individuals with disabilities. Opp. 13; *see* 29 U.S.C. § 794d. The language to which Defendants refer provides simply that if an individual with a disability chooses to file a complaint against a federal agency for failing to make technology accessible, the agency will apply its administrative procedures to resolve the administrative complaint. 29 U.S.C. § 794d(f)(2). Nothing in this provision "reiterate[s]" that administrative complaints are the *exclusive* remedy for violations of section 504. To the contrary, section 508(g) makes clear that section 508 "*shall not be construed* to limit any right, remedy, or procedure otherwise available under any provision of Federal law (including sections 501 through 505) that provides greater or equal protection for the rights of individuals and disabilities than this section." (emphasis added).

In sum, Defendants argue that at the same time Congress expanded and strengthened section 504 to prohibit Executive agencies from discriminating against individuals with disabilities, it intended to deny plaintiffs any ability to obtain review of their claims in court and instead provide only an "administrative" remedy. Opp. 13. The government declined to advance this absolutist argument in *Lane* and *Paulson*, and in fact argued the opposite in *Sai*. The Court should reject Defendants' argument here, which ignores the "rights-creating language" of section 504, Supreme Court precedent holding that identical provisions in Title VI and Tile IX create private rights of action, and the numerous cases holding that section 504 creates a private right of action for declaratory and injunctive relief against Executive agencies.

### B.        Plaintiffs May Also Pursue Their Rehabilitation Act Claim in Equity

Even if the Rehabilitation Act does not provide a private right of action to pursue declaratory and injunctive relief against Executive agencies, Plaintiffs may still pursue their claim "in equity." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).  In *Armstrong*, the Court acknowledged that "equitable relief . . . is traditionally available to enforce federal law." *Id.* at 329.  The ability to sue to enjoin unlawful actions by federal officers "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracking back to England." *Id.* at 327.  A plaintiff may proceed in equity for violations of a federal statute even if the statute at issue does not contain a private right of action. *See id.*

To be sure, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Id.*  Thus, if a federal statute displays an "intent to *foreclose*" equitable relief, then plaintiffs cannot "by invoking [the Court's] equitable powers, circumvent Congress's exclusion of private enforcement." *Id.* at 328 (emphasis added).  Here, nothing in the Rehabilitation Act displays an intent to foreclose equitable relief.  To the contrary, for the reasons explained above, all evidence suggests that Congress intended to *encourage* private enforcement of the statute.  But even if the Court were to conclude that section 504 is insufficiently clear so as to provide for a private right of action, certainly nothing in section 504 *forecloses* Plaintiffs from pursuing equitable relief against Executive agencies to ensure that they do not engage in unlawful discrimination.  And, unlike the Medicaid statute at issue in *Armstrong*, the text of section 504 is not "judicially unadministrable." *See id*.  Courts regularly administer suits alleging discrimination under the analogous provisions of the Americans with Disabilities Act, as well as Title VI (race discrimination) and Title IX (sex discrimination).  Accordingly, even if Plaintiffs lacked a private right of action, they could still pursue their claim against Defendants in equity.

### C.      Defendants Have Violated the Rehabilitation Act

Defendants do not dispute—and thus concede—that Plaintiffs satisfy two out of the three elements of their Rehabilitation Act claim.  Plaintiffs are individuals with disabilities because they are deaf (*see* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 2-1) ("Mot.") 12–13), and White House coronavirus briefings are programs or activities conducted by the agency Defendants (*see id.* at 14–15).  Defendants also do not dispute that the agency Defendants are "Executive agencies" for purposes of the Rehabilitation Act (29 U.S.C. § 794(a)).  *See* Mot. 14–15.  Nor do Defendants argue that providing in-frame ASL interpreters would result in a "fundamental alteration in the nature of a program or activity or in undue financial and administrative burdens."  3 C.F.R. § 102.160.

Defendants do appear to dispute—albeit in cursory fashion—that Defendants' failure to provide in-frame ASL interpreters has excluded Plaintiffs from, denied Plaintiffs the benefit of, and subjected Plaintiffs to discrimination in connection with the White House's coronavirus briefings.  *See* Mot. 13–14.  In particular, Defendants assert that Plaintiffs have access to these briefings through closed-captioning and after-the-fact written transcripts.  Opp. 10.  According to Defendants, that is enough to provide Plaintiffs "access to pandemic-related information through alternative, non-auditory means."  *Id.*  Defendants are wrong.

Defendants' argument is based on the incorrect assumption that all DHH persons can read and comprehend written English versions of the White House coronavirus briefings.  Defendants cite no factual or legal basis to support this assumption because there is none.  The record in this case is replete with evidence that Plaintiffs and many other DHH persons cannot read and understand written English text on complicated topics such as the coronavirus and the federal government's response to it.  Accordingly, they cannot understand closed-captioning or after-the-fact written transcripts of the White House coronavirus briefings.

As explained by Mr. Howard Rosenblum, CEO of the NAD, for many DHH individuals, "English is, at best, a second language." Rosenblum Decl. ¶ 3. Indeed, "many DHH persons know *virtually no English*." *Id.* (emphasis added). Written English is "not an effective means of communication for many deaf individuals who have limited English capabilities, particularly for complex and important topics such as COVID-19 and related issue of public health." *Id.* ¶ 6. "Therefore, even when closed-captioning is provided, those DHH individuals cannot effectively receive the messages conveyed at the White House press briefings." *Id.*

Additionally, each Plaintiff's declaration explains their own personal inability to understand White House coronavirus briefings without ASL interpretation, despite the presence of closed-captioning. For example, Mr. Rivera and Ms. Fleetwood explained that they are "not able to understand captioning on television when the content is complex, such as when there is information about a health pandemic." Rivera Decl. ¶ 3; Fleetwood Decl. ¶ 3. They "watched a number of the White House's Coronavirus press briefings . . . [but] cannot understand the briefings because there is no ASL interpreter during the briefings." *Id.* ¶ 4. Mr. Strail has "difficulty understanding rapid and unreliable live captioning on television, especially when the content is complex such as when there is information about a health pandemic." Strail Decl. ¶ 3. Mr. Axelrod and Mr. Forsey have "attempted to understand the White House's briefings on television, on the internet, and on social media, but . . . [are] often unable to do so because there is no ASL interpreter." Axelrod Decl. ¶ 4; Forsey Decl. ¶ 4. Defendants ignore this evidence.[5]

---

[5]   Plaintiffs' individual experiences are consistent with the scientific and academic consensus that many DHH persons have extremely limited proficiency in English. *See, e.g.*, Lauren Oberheim, *Selective Hearing: Communication Barriers in the Court System for Deaf and Hard-of-Hearing Victims of Rape or Sexual Assault*, 25 Wm. & Mary J. Race, Gender & Soc. Just. 163, 170 (2018) ("Only ten percent of deaf eighteen-year-olds achieve a tenth-grade reading level. Thirty percent of deaf students exit the school system 'functionally illiterate.'") (citations

Defendants also ignore evidence that the NAD and others informed the White House, before Plaintiffs filed suit, that closed captions were not enough to ensure meaningful access to the coronavirus briefings.  *See* Compl. Exs. A–E.  For example, on March 27, 2020, the Linguistic Society of America wrote to the White House:  "Please note that solely relying on closed-captioning is not an option for all ASL users, and that a certified sign language interpreter (who must remain visible during the entirety of each briefing) is necessary. . . . Failing to make this information available in ASL means that deaf people are not getting the same important information about health and safety."  Compl. Ex. D (Dkt. No. 1-4).  Likewise, the National Council on Disability, another federal agency, wrote to the White House:  "Millions of people in the US who are Deaf or hard of hearing use American Sign Language to obtain the vital information the Taskforce provides."  Compl. Ex. B (Dkt. No. 1-2).  None of these letters would have been necessary if closed captioning and written transcripts were sufficient to ensure DHH persons meaningful access to the White House coronavirus briefings.[6]

In their opposition, Defendants fundamentally mischaracterize Plaintiffs' position as having "issues" with closed-captioning and written transcripts that "make live ASL interpretation *preferable* for them."  Opp. 1 (emphasis added).  As demonstrated above, Plaintiffs require ASL interpretation in order to have meaningful access to White House coronavirus briefings; it is not

---

omitted); Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process*, 844 Wis. L. Rev. 843, 857 (2003) ("Among the prelingually deaf and severely hard-of-hearing, the median reading level for seventeen- and eighteen-year-olds is grade four. . . . [M]any deaf people do not understand the words we are using, even if the words are put into a visible form by writing or finger-spelling."); Jo Anne Simon, *The Use of Interpreters for the Deaf and the Legal Community's Obligation to Comply With the A.D.A.*, 8 J.L. & Health 155, 160 (1994) (average prelingually deaf adult reads at a fourth grade level).

[6]   To be sure, many DHH persons—including English speakers who have lost their hearing later in life and are not fluent in ASL—do, in fact, rely upon closed captions.  But many other DHH persons, including those who have been deaf since birth and for whom written English is not accessible, require ASL interpretation.  *See* Rosenblum Decl. ¶¶ 3–6; Compl. ¶¶ 24–25.

a matter of preference.  Courts consistently reject such attempts to paint DHH persons' requests for essential accommodations as expressions of mere preference.  *See, e.g.*, *McBride v. Mich. Dep't of Corr.*, 294 F. Supp. 3d 695, 710 (E.D. Mich. 2018) (rejecting argument that deaf plaintiff was seeking a "better" accommodation and finding the requested accommodation "necessary" to enable effective communication); *Majocha v. Turner*, 166 F. Supp. 2d 316, 323 (W.D. Pa. 2001) ("There is much more on the record than simply, as defendants characterize the matter, plaintiffs expressing their *preference* for a qualified ASL interpreter.").[7]

For example, in *Martinez*, Governor Cuomo argued that deaf New Yorkers could access his coronavirus briefings through closed captioning and other means, but the court disagreed: "The live broadcasts with closed captioning, while perhaps accommodating deaf New Yorkers who are fully literate in English, do not accommodate Plaintiffs and other similar deaf New Yorkers who cannot read English."  2020 WL 2393285, at *5.  Thus, "without in-frame ASL interpretation, Plaintiffs are, as a practical matter, [un]able to access benefits to which they are legally entitled."  *Id*.  The court also chided the governor for suggesting that deaf New Yorkers were "merely choos[ing] not to take advantage of the various means by which the Governor communicates critical information during his press briefings."  *Id*.  The court called this suggestion "unfounded, conclusory, and cavalier. . . . The current accommodations—however well-intentioned—simply do not provide meaningful access in the circumstances [presented] here."  *Id*.  Defendants ignore *Martinez* in its opposition, despite its clear application here.

Moreover, Defendants acknowledge that their own regulations under the Rehabilitation Act direct Defendants to give "primary consideration to the requests of the individual" with

---

[7]   Defendants also ignore the fact that closed-captioning frequently contains errors, omissions, and delays.  *See* Rosenblum Decl. ¶ 7; *see also* Compl. ¶ 45.

disabilities in determining "what type of auxiliary aid is necessary" to provide meaningful access.  3 C.F.R. § 102.160(a)(1)(i).  Here, Defendants continue to violate their own regulation by ignoring Plaintiffs' repeated requests for in-frame ASL interpreters.[8]

## II.   ALTERNATIVELY, PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM FOR MANDAMUS

In the alternative, if the Court were to conclude that the Rehabilitation Act does not provide a private right of action or a remedy, Plaintiffs would be likely to succeed on their claim for mandamus relief, which is available when "there is no other adequate remedy available to plaintiff."  *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005).[9]

Defendants contend that Plaintiffs are not likely to succeed on their mandamus claim because Plaintiffs do not have a "clear right" to relief.  Opp. 20.  To determine whether a "clear right" to relief exists, the Court must first interpret the statute and applicable regulations and then determine whether they "create[] a peremptory obligation for the officer to act."  *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980).  If they do, then "a mandamus action will lie."  *Id.*  Thus, "[t]he requirement that a duty be 'clearly defined' to warrant issuance of a writ does not rule out mandamus actions in situations where the interpretation of the controlling statute is in doubt."  *Id.*; *see also In re Cheney*, 406 F.3d 723,

---

[8]   To the extent the Court has any questions about the inability of many DHH persons to read and understand written English, particularly about complex topics, Plaintiffs intend to have an expert witness—Dr. Judy Shepard-Kegl, a linguist—attend the August 26 hearing.  Mr. Howard A. Rosenblum, CEO of NAD and a declarant in this case (Dkt. No. 2-8) will also attend the hearing.  Plaintiffs do not plan on offering testimony from either witness at this time, but both will be available at the hearing to answer any questions that the Court may have.

[9]   Plaintiffs are likely to succeed on their mandamus claim regardless of whether the Rehabilitation Act provides a private right of action.  "The mandamus statute may provide an avenue to remedy violation of statutory duties even when the statute that creates the duty does not contain a private cause of action."  *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 33–34 (D.D.C. 2011); *see also Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 41–42 (D.D.C. 2002).

729 (D.C. Cir. 2005).  Even if the statute and regulations are "ambiguous," *Cheney*, 406 F.3d at

729, Plaintiffs may still be entitled to mandamus if the statute "*once interpreted*" establishes a

clear right to relief, *13th Reg'l Corp.*, 654 F.2d at 760 (emphasis added).

 As discussed above, the Rehabilitation Act and EOP regulations, once interpreted,

establish a clear right to relief.  *See supra* Section I.C.  Contrary to Defendants' argument,

Defendants do not have "discretion" to deny a feasible and effective accommodation (ASL

interpreters) and instead insist upon an accommodation that is not effective for so many (closed

captioning and transcripts).  Opp. 21.  The EOP regulations require that Defendants "*shall*

furnish appropriate auxiliary aids" to afford DHH individuals "an *equal* opportunity to

participate in, and enjoy the benefits of" programs or activities conducted by Defendants.  3

C.F.R. § 102.160(a)(1) (emphasis added).  In determining what type of accommodation is

necessary, Defendants "*shall* give primary consideration to the requests of the individuals with

handicaps."  *Id.* § 102.160(a)(1)(i) (emphasis added).  Nor would complying with the

Rehabilitation Act and EOP regulations affect any discretionary White House policies and

indeed would not change the content of the press briefings in any manner.  The act of arranging

for an ASL interpreter to be present at White House briefings is administrative and precisely the

kind of "ministerial" duty that an official "has no authority to determine whether to perform."

*Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).  Mandamus relief is available and

warranted here.

## III. PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IF A PRELIMINARY INJUNCTION IS NOT GRANTED

 Defendants do not dispute—and thus concede—that Plaintiffs are likely to suffer

irreparable harm in the absence of injunctive relief.  This is significant, as irreparable harm is

"perhaps the single most important prerequisite for the issuance of a preliminary injunction."

*Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 289 (D.D.C. 2017). Here,

where the health and safety of all DHH persons in America is at stake (*see* Mot. 17–19), this

factor decisively favors granting a preliminary injunction.

## IV.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PLAINTIFFS

Defendants also do not dispute—and thus concede—that "[r]etaining qualified and

effective sign language interpreters is relatively inexpensive and administratively feasible." Mot.

19. Indeed, Defendants do not argue that providing interpreters would impose any undue burden

on the White House at all. Nor could it, as all 50 states' governors have provided ASL

interpreters at coronavirus briefings—a fact which Defendants ignore.

Defendants state that the Press Briefing Room "is a small space." Opp. 3–4. But

Defendants never assert that this would create any actual hardship or prevent Defendants from

providing Plaintiffs with the relief that they seek. Moreover, even if it did present a logistical

challenge, it would only affect Defendants' ability to place an interpreter physically near the

speaker. As Plaintiffs have explained, however, in-frame ASL interpretation could also be

accommodated by using a picture-in-picture ("PIP") interpreter, which superimposes a live video

feed of the interpreter into a frame that appears alongside the speaker. *See* Mot. 6 n.9. With PIP,

the interpreter would not need to be physically next to the speaker in the Press Briefing Room—

or even in the same room—but could be located somewhere else, watching a live feed of the

speaker and interpreting in front of a camera providing the PIP video feed. Several governors,

including Governor Cuomo, have used PIP interpreters for their coronavirus briefings.

Significantly, Defendants do not dispute that the Press Office has the ability to "arrange for an

interpreter at a different location" than the briefing room "to conduct a simultaneous direct-to-camera interpretation."  Deere Decl. ¶ 7.[10]

Defendants also assert that the relief Plaintiffs request is "broad" and "new."  Opp. 22–23.  Neither contention has merit.  As to breadth, Plaintiffs are requesting the same relief that all 50 governors have provided:  an ASL interpreter at public briefings addressing the pandemic. Plaintiffs are not requesting that Defendants provide interpreters in situations that are "outside of Defendants' control."  Opp. 23.  To the extent Defendants have genuine objections to the scope of the requested relief, Plaintiffs would be willing to meet and confer to attempt to address any such concerns.  But Defendants' position appears to be that they will not provide *any* ASL interpreters at *any* White House briefings—wherever they are located, however far in advance they are planned, and regardless of whether the briefing is narrowly tailored to the pandemic.

As to Defendants' argument that an ASL interpreter "would be new at the White House" (Opp. 23), that is not a "hardship."  Nor is it a reason why a preliminary injunction would not be in the public interest.  A global pandemic that has killed (to date) over 170,000 Americans is itself a "new" development—at least in the era of televised press briefings—that justifies a "new" approach by the White House to ensuring that all deaf persons have meaningful access to the same public health information the White House is providing to everyone else.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.

---

[10]   The government states that Defendants do not control "whether a tight shot or wide shot is used," and thus cannot control whether a particular network would actually film the ASL interpreter.  Opp. 4.  This hypothetical and highly speculative scenario about potential third-party conduct cannot justify the government's *own* refusal to provide interpreters.  Moreover, that ASL interpreters have appeared in frame with so many governors is sufficient to reject this suggestion.

Dated: August 20, 2020

/s/ Ian S. Hoffman
Ian S. Hoffman (D.C. Bar No. 983419)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Fax: (202) 942-5999

*Counsel for Plaintiffs*

/s/ Marc Charmatz
Marc Charmatz**
NAD Law and Advocacy Center
86 30 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone: (301) 587-1788
Fax: (301) 587-1791

***admitted pro hac vice*

*Counsel for Plaintiffs*