UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF THE
DEAF, *et al.*,

      Plaintiffs,

         v.

DONALD J. TRUMP, *et al.*,

      Defendants.

Civil Action No. 20-2107 (JEB)

## MEMORANDUM OPINION

Over the past six months, the coronavirus pandemic has changed the rhythms of our daily lives: businesses have closed, homes have become schoolhouses, and loved ones have fallen ill. Through this uncertain period, people have understandably sought up-to-date information about the course of the virus and how best to stay safe. Plaintiffs here are the National Association of the Deaf and five deaf individuals whose primary and preferred language is American Sign Language. For updates about the pandemic, these people have tried to tune into briefings by President Donald Trump and members of the White House Coronavirus Task Force. But their ability to understand the information presented has often been stymied by the briefings' lack of an ASL interpreter.

They thus brought this action against the President, Vice President Mike Pence, the Executive Office of the President, the White House Office, the Office of the Vice President, and Press Secretary Kayleigh McEnany, alleging that Defendants' failure to provide ASL interpreters during these briefings violates the Rehabilitation Act of 1973 and the First Amendment. Plaintiffs now ask this Court to grant a preliminary injunction requiring Defendants to provide

in-frame ASL interpretation throughout all live, televised public briefings conducted by any Defendant or member of the White House Coronavirus Task Force that address issues concerning COVID-19.

While the Court agrees that Plaintiffs have met their burden to obtain some form of injunctive relief, the contours of an appropriate remedy need some fleshing out, given the lack of clarity regarding the precise logistics involved in making ASL interpretation available via various platforms. The Court, accordingly, will conduct a further hearing to plumb in greater depth the practicalities of implementing its Order.

## I.      Background

President Trump began holding regular televised briefings about the COVID-19 outbreak in March of 2020. See ECF No. 1 (Compl.), ¶ 26. Although generating controversy at times, the briefings have addressed critical issues ranging from information on social distancing and mask wearing, to updates on economic-relief packages and vaccine development. Id., ¶¶ 29, 31. Members of the White House Coronavirus Task Force, including Dr. Anthony Fauci and Dr. Deborah Birx, have also appeared to provide analysis and updates on relevant public-health information. Id., ¶¶ 20, 30. So, too, have Press Secretary McEnany and Vice President Pence, who heads the Task Force and has spoken to "what every American can do to play their part in reducing the spread and the impacts of the coronavirus pandemic." Id.; see also ECF No. 9-1 (Declaration of Judson P. Deere), ¶ 4. The White House initially held daily briefings, but their frequency decreased by late spring before again being held more regularly starting in late July. See Compl., ¶ 31.

Members of the public have a few options for how to watch the briefings. People can watch: (1) live and delayed coverage on network and cable television channels, when and if the

media chooses to air the proceedings; (2) live footage that the White House shares on its website and YouTube channel; or (3) recordings that the White House posts after the live event ends on its social-media platforms, such as YouTube and Facebook.  See Deere Decl., ¶¶ 5–6, 8; see also ECF No. 15-1 (Second Declaration of Judson P. Deere), ¶¶ 6–7.  Private media outlets and the White House Communications Agency, which provides telecommunications and other related support services to the President and Vice President, record the briefings.  See Second Deere Decl., ¶¶ 3–5, 9.  While private media outlets air the footage that they capture on network and cable television, WHCA airs its recordings on the platforms that the White House controls.  See Deere Decl., ¶¶ 5–6, 8.  On occasion, such as when a coronavirus briefing is not held in the Press Briefing Room, WHCA does not record the event and instead streams a video feed that a private media outlet records and shares.  Id., ¶ 8; Second Deere Decl., ¶ 9.

The White House also contracts with a third party to provide closed captioning for the livestream and post-briefing recordings that it posts on its YouTube channel and Facebook page. See Deere Decl., ¶ 8; Second Deere Decl., ¶ 8.  Networks and cable television stations similarly provide closed captioning when they air the briefings.  Id., ¶ 13; see also ECF No. 9 (Def. Opp.) at 1, 21.  Additionally, and generally within hours of the briefings, the White House posts a complete transcript in English on its official website and provides the same to reporters and media organizations.  See Def. Opp. at 1, 5; Deere Decl., ¶ 14.

Unlike the governors of all fifty states, the mayors of cities large and small, and leaders from around the globe, however, the White House does not provide in-frame ASL interpretation during its video broadcasts.  See Compl., ¶ 2.  Plaintiffs assert that, as a result, they cannot access the "critical, potentially life-saving information" that the nation's leaders and public-health officials share during the briefings without ASL interpretation.  See id., ¶ 1; ECF No. 2-5

(Declaration of Corey Axelrod), ¶ 3; ECF No. 2-4 (Declaration of Debra Fleetwood), ¶ 4; ECF

No. 2-7 (Declaration of Graham Forsey), ¶ 3; ECF No. 2-3 (Declaration of John Rivera, Jr.), ¶ 4;

ECF No. 2-6 (Declaration of Carlton Strail), ¶ 4; ECF No. 2-8 (Declaration of Howard A.

Rosenblum), ¶¶ 2, 4.  Nor, Plaintiffs explain, can they access the updates on the impact of the

pandemic on the economy and on vaccine development.  See Compl., ¶ 1; see also Axelrod

Decl., ¶ 5; Fleetwood Decl., ¶ 5; Forsey Decl., ¶ 5; Rivera Decl., ¶ 5; Strail Decl., ¶ 5.  Because

of these barriers, Plaintiffs assert that they are unable to obtain from the briefings information on

how to protect themselves and their families.  See Fleetwood Decl., ¶¶ 1, 3; Rivera Decl., ¶¶ 1, 3;

Strail Decl., ¶ 5.  Additionally, Plaintiffs Axelrod and Forsey, who lead the Illinois Association

of the Deaf and the District of Columbia Association of the Deaf, respectively, declare that this

means that they are less able to answer questions about the briefings and pandemic from their

groups' members.  See Axelrod Decl., ¶¶ 1, 5; Forsey Decl., ¶¶ 1, 5.

      Plaintiffs contend, moreover, that the closed captioning that Defendants and the networks

provide is an insufficient remedial measure for a variety of reasons.  As Howard A. Rosenblum,

the CEO of NAD, explains in his declaration, "[M]any [deaf and hard-of-hearing] persons know

virtually no English."  Rosenblum Decl., ¶ 3.  For many others, "English is, at best, a second

language."  Id.  The primary language of many of NAD's members is ASL, which is "a complete

and complex language distinct from English, with its own vocabulary and rules for grammar and

syntax."  Id., ¶¶ 4–5.  Because of the differences between English and ASL, "[w]ritten English is

not an effective means of communication for many deaf individuals who have limited English

capabilities, particularly for complex and important topics such as COVID-19 and related

issue[s] of public health."  Id., ¶ 6.  NAD asserts that it has received hundreds of complaints from

deaf and hard-of-hearing people who say that they are unable to access the information that the

White House provides during the COVID-19 briefings because of the lack of an in-frame ASL interpreter.  Id., ¶ 2.

Individual Plaintiffs aver the same.  For Fleetwood, Rivera, and Strail, who range in age from sixty-six to ninety-two and receive most or all of their news from television, closed captioning is insufficient because they have difficulty "understand[ing] captioning on television when the content is complex, such as when there is information about a health pandemic." Fleetwood Decl., ¶¶ 1, 3; see also Rivera Decl., ¶¶ 1, 3; Strail Decl., ¶¶ 1, 3.  For Axelrod and Forsey, who are in their twenties and thirties, closed captioning is insufficient because it is often delayed and inaccurate, and not available on the Internet or social media.  See Axelrod Decl., ¶¶ 1, 4; Forsey Decl., ¶¶ 1, 4.

Seeking to gain access to the information shared in the White House's COVID-19 briefings, Plaintiffs filed this suit.  In their Complaint, they allege that Defendants' failure to provide an ASL interpreter during the briefings violates both section 504 of the Rehabilitation Act and the First Amendment, and thus warrants declaratory and injunctive relief.  See Compl., ¶¶ 49–73.  Simultaneous with the filing of their Complaint, Plaintiffs moved for a preliminary injunction based only on their Rehabilitation Act claim and request for mandamus relief.  See ECF No. 2 (Pl. Mot.) at 1; see also ECF No. 2-1 (Pl. Mot. Memo) at 2, 17 n.6.  To arrest these purported transgressions, Plaintiffs ask this Court to order Defendants to immediately begin providing live, in-frame ASL interpretation in all public briefings that address COVID-19 and are conducted by any Defendant or member of the White House Coronavirus Task Force.  See Pl. Mot. Memo at 20.

The Court heard argument on Plaintiffs' Motion on August 26 and received a supplemental declaration from Defendants and response from Plaintiffs on August 31 concerning

some of the logistics of the video process.  <u>See</u> ECF Nos. 15 (Def. Supp.) & 16 (Pl. Supp.).  In their supplemental filing, Plaintiffs narrowed and clarified the scope of their remedy request and now ask this Court to order Defendants to provide the following during all White House briefings about the coronavirus that are conducted by Defendants, are announced in advance, and have a purpose of discussing issues related to the pandemic: 1) in-frame ASL interpretation, either by including in the video frame the ASL speaker or by including a picture-in-picture (PIP) interpreter in the footage, on all WHCA video feeds of the briefings; and 2) either placement of an ASL interpreter physically near the speaker during briefings so that media outlets can capture footage of the ASL interpreter, or the creation of a live feed of an ASL interpreter that is available for broadcast outlets to include in PIP footage.  <u>See</u> Pl. Supp. at 3.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  <u>Winter v. NRDC</u>, 555 U.S. 7, 24 (2008).  A party seeking preliminary relief must "make a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'"  <u>League of Women Voters v. Newby</u>, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting <u>Pursuing America's Greatness v. FEC</u>, 831 F.3d 500, 505 (D.C. Cir. 2016)).  "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted."  <u>Hospitality Staffing Solutions, LLC v. Reyes</u>, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Historically, this Circuit has evaluated the preliminary-injunction factors on a "sliding scale," under which if the "movant makes an unusually strong showing on one of the factors,

then it does not necessarily have to make as strong a showing on another factor." Davis v.
Pension Ben. Guar. Corp., 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). This Circuit has hinted,
though not held, that Winter — which overturned the Ninth Circuit's "possibility of irreparable
harm" standard — should be read to abandon the sliding-scale approach in favor of requiring that
"likelihood of irreparable harm" and "likelihood of success" are "'independent, free-standing
requirement[s].'" Sherley v. Sebelius, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (quoting Davis,
571 F.3d at 1296) (Kavanaugh, J., concurring); see Singh v. Carter, 185 F. Supp. 3d 11, 16–17
(D.C. Cir. 2016) (calling the "sliding scale approach" "highly questionable" after Winter and
requiring the plaintiff to "bear[] the burden of persuasion on all four preliminary injunction
factors"); League of Women Voters, 838 F.3d at 7 (declining to address whether "sliding scale"
approach is valid after Winter). Unresolved, too, is the related question of "whether, in cases
where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a
serious legal question on the merits." Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014)
(internal quotation and citation omitted).

Regardless of the extent to which showings of irreparable harm and success on the merits
can be diminished, some fundamentals of the four-factor test bear reiterating. Because "the basis
of injunctive relief . . . has always been irreparable harm," Chaplaincy of Full Gospel, 454 F.3d
at 297 (citation omitted), a plaintiff must, at minimum, "demonstrate that irreparable injury is
likely in the absence of an injunction," not just that injury is a "possibility." Winter, 555 U.S. at
21–22; see Davis, 571 F.3d at 1292. Before and after Winter, similarly, this Circuit has
maintained its standard that a plaintiff may obtain relief after demonstrating a "substantial
likelihood" of success. See Pursuing America's Greatness, 831 F.3d at 505. Where the plaintiff
can show neither harm nor success, no relief is warranted. Standing Rock Sioux Tribe v. U.S.

<u>Army Corps of Eng'rs</u>, 205 F. Supp. 3d 4, 26 (D.D.C. 2016); <u>see also</u> <u>Ark. Dairy Co-op Ass'n,</u>

<u>Inc. v. USDA</u>, 573 F.3d 815, 832 (D.C. Cir. 2009) (denying injunction when plaintiff shows "no

likelihood of success").

**III.    Analysis**

Plaintiffs contend that Defendants have violated and will continue to violate the

Rehabilitation Act by failing to provide an ASL interpreter during the White House's briefings

on the coronavirus.  <u>See</u> Pl. Mot. Memo at 1–2, 18; ECF No. 11 (Pl. Reply) at 18.  They argue

that, without a preliminary injunction, they will continue to suffer irreparable harm because they

will not have access to the information that the White House shares during those briefings about

personal safety, public health, and the economy.  <u>See</u> Pl. Mot. Memo at 17–19; Reply at 23.

Defendants respond that Plaintiffs cannot succeed here both because they lack a cause of action

and because they have access to the briefings via other, non-auditory means.  <u>See</u> Def. Opp. at

10–14.

The Court kicks off with Plaintiffs' likelihood of success before addressing the remaining

preliminary-injunction factors and then the nuanced question of remedy.  Because it finds that

Plaintiffs have carried their burden under the Rehabilitation Act, it does not reach the parties'

arguments on Plaintiffs' mandamus claim.

A.  <u>Likelihood of Success</u>

As Defendants' central position here is that the Rehabilitation Act provides no express or

implied cause of action, a sensible starting point is the statute itself.

*1.   Statutory Framework*

Congress enacted the Rehabilitation Act in 1973 "to ensure that members of the disabled

community could live independently and fully participate in society."  <u>American Council of the</u>

Blind v. Paulson, 525 F.3d 1256, 1259 (D.C. Cir. 2008).  It was the "first major federal statute designed to protect the rights of and provide assistance to" individuals with disabilities.  Smith v. Barton, 914 F.2d 1330, 1338 (9th Cir. 1990).  As originally enacted, section 504 of the Act prohibited recipients of federal financial assistance from conducting programs or activities that discriminate on the basis of disability.  See Rehabilitation Act of 1973, Pub. L. No. 93–112, § 504, 87 Stat. 394 (Sept. 26, 1973).

In 1978, Congress undertook to "extend and strengthen" the Rehabilitation Act and enacted numerous amendments.  Doe v. Att'y Gen. of U.S., 941 F.2d 780, 785 (9th Cir. 1991) (collecting legislative history), disapproved of on other grounds by Lane v. Pena, 518 U.S. 187 (1996).  As relevant to this case, it amended section 504 to prohibit discrimination by "any Executive agency."  See Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95–602, § 504, 92 Stat. 2955 (Nov. 6, 1978).  As amended, section 504 provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794(a) (emphasis added).  With the same amendment, Congress also instructed the heads of Executive agencies to promulgate regulations to "carry out" the 1978 addition of "Executive agency" to section 504.  Id.

Congress did not define "Executive agency," but, pursuant to section 504's command to "carry out" the amendments, the Executive Office of the President promulgated regulations in 1988 to prohibit discrimination based on disability.  See Def. Opp. at 7; 3 C.F.R. § 102.101 (explaining purpose of regulation is to effectuate 1978 Rehabilitation Act amendments, including

section 504 amendments); 3 C.F.R § 102.102 (noting that regulations apply to "all programs or activities conducted" by Executive Office of President). The regulations apply to the White House Office and Office of the Vice President, among others. See 3 C.F.R. § 102.103 (defining "Agency" as "entities in the Executive Office of the President," including "the White House Office" and "Office of the Vice President").

In addition to expanding the prohibition on discrimination to the programs and activities of Executive agencies in 1978, Congress added section 505, entitled "Remedies and attorneys' fees," to the Act. See Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95–602, § 505, 92 Stat. 2955 (Nov. 6, 1978). Pursuant to this section, plaintiffs can seek remedies for violations of section 501 of the Act — which addresses discrimination by the federal government when it acts as an employer, see 29 U.S.C. § 791 — via the procedures set forth in Title VII's comprehensive scheme. See 29 U.S.C. § 794a(a)(1). Additionally, section 505 enables plaintiffs who bring claims against recipients of federal financial assistance to obtain relief for violations of section 504 of the Act through Title VI's remedial scheme. Id. § 794a(a)(2).

In enacting section 505, however, Congress did not say what remedies are available to persons aggrieved by Executive agencies' violations of the Act and did not point to the comprehensive scheme of another statute. In Lane, the Supreme Court considered a suit brought by a private plaintiff against an Executive agency under section 504 and held that, in amending the statute in 1978, Congress did not waive sovereign immunity for plaintiffs to obtain monetary damages. See 518 U.S. at 189, 197. In considering section 504, however, the Supreme Court did not address the source of the plaintiff's cause of action, nor the propriety of a district court's awarding declaratory or injunctive relief against an Executive agency. Id. at 190, 196 (noting

that government did not appeal district court's award of injunctive relief).  That void, in the statute and caselaw, is central to the parties' dispute here.

### 2. Application

The statutory backdrop thus provided, the Court must now address two fundamental questions: whether section 504 offers Plaintiffs any cause of action here, and, if so, whether they have sufficiently articulated one.  Defendants spend most of their opposition arguing the first issue, which the Court agrees is the more complex one.  It, too, will linger here before turning to the merits of Plaintiffs' particular claim.

### a. Implied Cause of Action

"[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person."  Cannon v. Univ. of Chicago, 441 U.S. 677, 688 (1979).  Rather, "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  Alexander v. Sandoval, 532 U.S. 275, 286 (2001).  In determining whether a statute implies a private right of action, "[t]he guiding principle . . . is legislative intent," El Paso Nat. Gas Co. v. United States, 750 F.3d 863, 889 (D.C. Cir. 2014), and courts must "determine whether [the statute] displays an intent to create not just a private right but also a private remedy."  Sandoval, 532 U.S. at 286.  This analysis "begins with the text and structure of the statute," and courts can look to legislative history for support.  Lee v. U.S. Agency for Int'l Dev., 859 F.3d 74, 77–78 (D.C. Cir. 2017) (considering relevant legislative history).  Although numerous other courts across the country and in our district have considered the section 504 question, there is no binding Circuit authority. See J.L. v. Soc. Sec. Admin., 971 F.2d 260, 264 (9th Cir. 1992) (finding that plaintiffs can be entitled to equitable relief to remedy Executive agency's section 504 violations), disapproved of

on other grounds by Lane, 518 U.S. at 191, 200; McRaniels v. U.S. Dep't of Veterans Affairs,
No. 15-802, 2017 WL 2259622, at *4 (W.D. Wis. May 19, 2017) (finding private right of
action); but see Sai v. Dep't of Homeland Sec., 149 F. Supp. 3d 99, 113 (D.D.C. 2015)
(concluding that "the cause of action for a substantive claim of disability discrimination in a
federal program or activity . . . arises under the APA," not the Rehabilitation Act).  This Court
must therefore conduct its own examination.

   It begins with the language in section 504, which guarantees that "[n]o otherwise
qualified individual with a disability in the United States . . . shall . . . be subjected to
discrimination . . . under any program or activity conducted by any Executive agency . . . ."  29
U.S.C. § 794(a).  The Supreme Court has consistently found the phrasing "[n]o [person] . . . shall
. . . be subjected to discrimination" to be "'rights-creating' language."  Sandoval, 532 U.S. at
278–79 (recognizing existence of private cause of action under section 601 of Title VI, which
provides that "[n]o person . . . shall, on the ground of race, color, or national origin, . . . be
subjected to discrimination under any program or activity receiving Federal financial assistance,"
42 U.S.C. § 2000d); Cannon, 441 U.S. at 709 (same for section 901 of Title IX, which provides
that "[n]o person . . . shall, on the basis of sex, . . . be subjected to discrimination under any
education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a)); see
also Pl. Reply at 4–5.  In considering the parallel phrasing of Title IX, moreover, the Supreme
Court has found the language to be "the most accurate indicator of the propriety of implication of
a cause of action."  Cannon, 441 U.S. at 690 n.13; see also Pl. Reply at 4.  The Court,
consequently, agrees with Plaintiffs that the language of section 504 indicates that Congress
intended to create a private cause of action.  See Pl. Mot. Memo at 4–6.

The history of the statute provides support for this conclusion, as the parallel language among the Rehabilitation Act, Title VI, and Title IX was not a curious coincidence.  Rather, the text of section 504 was modeled on the language of section 601 of Title VI, which Congress knew had been interpreted to provide private rights of action.  See Doe, 941 F.2d at 786–87.  This Court, as a result, may properly conclude that Congress created a private right of action in the Rehabilitation Act because section 504 includes "the verbatim statutory text that courts had previously interpreted to create a private right of action," Sandoval, 532 U.S. at 288, and because "[t]he drafters . . . explicitly assumed it would be interpreted and applied as Title VI had been." Cannon, 441 U.S. at 694–95; Sandoval, 532 U.S. at 279–80 (applying Cannon's logic); cf. 124 Cong. Rec. 30,349 (1978) (colloquy between Sen. Cranston, a co-sponsor of the Senate 1978 Rehabilitation Act bill, and Sen. Bayh on "the continuing intention of Congress that private actions be allowed under titles VI and VII of the Civil Rights Act of 1964, title IX of the Education Amendments of 1972 and title V of the Rehabilitation Act of 1973"); Doe, 941 F.2d at 786 (collecting cases, decided between 1973 and 1978, in which courts determined Congress created private right of action in section 504).

The structure of the Rehabilitation Act further indicates that Congress intended to create a private remedy for equitable relief, rather than — as Defendants argue — requiring plaintiffs to rely on the Administrative Procedure Act's remedial scheme for rights enforcement.  See Def. Opp. at 8, 14.  Simultaneous with its amending section 504 to add "Executive agenc[ies]" as actors prohibited from discriminating based on disability, Congress also enacted section 505, entitled "Remedies and attorneys' fees."  29 U.S.C. § 794a; see also Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95–602, § 504.  In this subsection, the legislature clarified that two subsets of plaintiffs should look

to the remedial schemes of other statutes to redress their harms.  First, employees who bring suit against the federal government for violations of section 501 are subject to the requirements of and have access to Title VII's remedial scheme.  See 29 U.S.C. § 794a(a)(1).  Second, private parties who bring suits against recipients of federal funds for violations of section 504 can invoke Title VI's remedial scheme.  See id. § 794a(a)(2).

While Congress undertook in section 505 to enact new provisions to clarify which plaintiffs should look to the remedial schemes of other statutes, it never directed those plaintiffs who seek relief from Executive agencies' violations of section 504 to rely on the Administrative Procedure Act.  Nor would it make sense to assume — particularly when the text of section 504 indicates otherwise — that Congress intended to direct such plaintiffs to the APA's remedial scheme when section 504's reference to "any Executive agency" is meant to be more inclusive of entities than is the APA's definition of an agency.  See 7 Op. O.L.C. 110, 111–15 & n.13 (1983) (explaining after extensive examination of legislative history that Congress intended "Executive agency" to be "construed broadly to include all governmental entities which are not within either the Legislative or Judicial Branches," and did not intend "an entity's status under the APA . . . to determine its coverage by [section] 504"); compare 3 C.F.R. § 102.103 (defining "Agency" to include various "entities in the Executive Office of the President," including "the White House Office" and "Office of the Vice President"), with Def. Opp. at 8–9 (explaining that President, Vice President, and components of Executive Office of President that are close advisors to President are immune from suit under APA).

This understanding of section 504 — namely, that private parties can rely on it in bringing suits against Executive agencies for injunctive and declaratory relief — is shared by many courts across the country.  See Pl. Mot. Memo at 7–10; see also, e.g., Doe, 941 F.2d at

789; J.L., 971 F.2d at 264; Yeh v. U.S. Bureau of Prisons, No. 18-943, 2019 WL 3713874, at *5 (M.D. Pa. May 15, 2019) ("[A] plaintiff may bring a claim for injunctive relief under section 504(a) of the [Rehabilitation Act] against [Executive] agencies and individuals acting in their official capacities"); Davis v. Astrue, No. 06-6108, 2011 WL 3651064, at *5 (N.D. Cal. Aug. 18, 2011) (considering history of Rehabilitation Act amendments and concluding that Congress created private right of action under section 504 for declaratory and injunctive relief against Executive agencies); Washington v. Fed. Bureau of Prisons, No. 16-3913, 2019 WL 2125246, at *8 (D.S.C. Jan. 3, 2019) (collecting cases and concluding same), report and recommendation adopted, No. 16-3913, 2019 WL 1349516 (D.S.C. Mar. 26, 2019); McRaniels, 2017 WL 2259622, at *4 (concluding, in suit against Executive agency, that "reading sections 504 and 505 [of the Rehabilitation Act] together compels a finding of an implied private right of action."); Howard v. Bureau of Prisons, No 05-1372, 2008 WL 318387, at *9 (M.D. Pa. Feb. 4, 2008) ("With regard to the Rehabilitation Act . . . , injunctive relief is available even though damages are not" in suits against Executive agencies).

Courts in this district have generally shared that approach.  See American Council of the Blind v. Paulson, 463 F. Supp. 2d 51, 57–58 (D.D.C. 2006), aff'd, 525 F.3d 1256 (D.C. Cir. 2008) (recognizing private right of action against government in holding that sovereign immunity does not bar private-plaintiff claims under section 504 against Executive agency for injunctive relief); Lane v. Pena, 867 F. Supp. 1050, 1053 (D.D.C. 1994) (granting injunction against Executive agency for violation of section 504 and noting that "[i]t is well-established that injunctive and declaratory relief are available under the Rehabilitation Act") (quoting Doe v. District of Columbia, 796 F. Supp. 559, 573 (D.D.C. 1992)), vacated in part on other grounds by Lane, 518 U.S. at 190–91; but see Sai,149 F. Supp. 3d at 113 (finding that cause of action arises

under APA).  Given this general consensus, as well the decisions in <u>Paulson</u> and <u>Lane</u> in this district, it is unsurprising that in 2015, <u>Defendants themselves</u> argued to a court here that "Section 504 implies a private right of action to sue for injunctive relief in federal court for violations of that section that is not dependent on administrative exhaustion."  Defendants' Reply in Support of Motion to Dismiss at 12, <u>Sai</u> (No. 14–1876) (citing <u>Paulson</u>).  As the court explained in <u>Sai</u>, Defendants advocated that "the Rehabilitation Act 'implies a private right of action to sue for injunctive relief in federal court' for violations of the <u>substantive</u> rights protected by Section 504, but the Act does not create a private right of action for violations of the <u>administrative</u> rules at issue [t]here."  149 F. Supp. 3d at 110.

Today, however, Defendants advocate for a different reading of Congress's intent.  They now contend that because section 505 is the only provision of the Rehabilitation Act that addresses what, if any, remedies are available to plaintiffs for violations of section 504, and because that subsection says nothing about suits against Executive agencies, Congress did not intend to create a private right of action therein.  <u>See</u> Def. Opp. at 12.  Turning back to section 504, Defendants note that, when Congress amended that subsection in 1978, it instructed the head of Executive agencies to "promulgate such regulations as may be necessary to carry out" the law's addition of "any Executive agency."  <u>Id.</u>; <u>see also</u> 29 U.S.C. § 794; Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95–602, § 504.  The Government thus maintains that reading sections 504 and 505 together reveals that Congress intended for a regulatory scheme — and thus the APA — to remedy any violations.  <u>See</u> Def. Opp. at 12.

To support this argument, Defendants point to a number of decisions that come out their way.  <u>Id.</u> at 11 & n.2.  Yet, as Plaintiffs correctly point out, <u>see</u> Reply at 10, these cases are

distinguishable from the previously cited ones because they all dealt with Executive agencies'

acting as a regulator, as opposed to in a substantive capacity.  See, e.g., Cousins v. Sec'y of the

U.S. Dep't of Transp., 880 F.2d 603 (1st Cir. 1989) (assessing deaf plaintiff's challenge to DOT

hearing-requirement regulation for commercial motor-vehicle drivers, and DOT's decision not to

waive that regulatory requirement, and finding that question of "how a person injured by the

government [acting as regulator" is addressed under APA); Clark v. Skinner, 937 F.2d 123,

125–27 (4th Cir. 1991) (considering plaintiff's challenge to Federal Highway Administration's

regulation prohibiting limb-impaired persons from driving commercial vehicles, and finding no

"§ 504 private cause of action against the United States government in its capacity as a

regulator") (emphasis added); Kinneary v. City of N.Y., 358 F. Supp. 2d 356, 359 (S.D.N.Y.

2005) (considering challenge to Coast Guard's suspension of plaintiff's license to operate

municipal tanker in coastal waters for failure to comply with regulations requiring random drug

testing, and declining to "read[] the Rehabilitation Act to create a cause of action against the

federal government when acting in its role as a regulator") (emphasis added).

    Defendants also direct the Court to Sai, in which Judge Randolph Moss of this district

considered whether a claim alleging that the Department of Homeland Security and the

Transportation Security Administration violated a plaintiff's rights by failing to respond to his

administrative complaints fell under the Rehabilitation Act or the APA.  See 149 F. Supp. 3d at

99; see also Def. Opp. at 12.  Without benefit of adversarial briefing, Judge Moss found it "easy

to imagine [that] Congress would not have created a private cause of action to enforce Section

504 against federal agencies . . . [because] it knew that review would be available under the

APA."  Id. at 113.  He found the logic of Cousins compelling, particularly its reliance on the

"purpose[] of the APA to provide a 'single uniform method for review of agency action.'"  Id. at

114 (quoting <u>Cousins</u>, 880 F.2d at 605); <u>see also</u> <u>Cousins</u>, 880 F.2d at 605 (warning that "[t]o allow actions for review of agency action once again to proliferate under a variety of names would threaten a return to pre-APA confusion"). <u>Sai</u> proceeded to reject the distinction between the government's acting as regulator and as discriminator because governmental acts of discrimination that can be remedied by declaratory or injunctive relief "are likely to involve either demands for relief that have been formally rejected or established rules or procedures that fail to comply with the [Rehabilitation] Act." <u>Id.</u> at 115.

While this Court recognizes the force of <u>Sai</u>'s reasoning as to why Congress could or perhaps even should have pointed plaintiffs to the APA, it ultimately cannot conclude that the purpose of that Act can overcome the "rights-creating" language of the text that Congress included in section 504 and that the Supreme Court has consistently found creates a private right of action. <u>See</u> <u>Sandoval</u>, 532 U.S. at 279; <u>see also</u> <u>Cannon</u>, 441 U.S. at 709. The Court also notes that following <u>Sai</u>, as Defendants explain, would leave Plaintiffs without a judicial remedy. <u>See</u> Def. Opp. at 14–19 (explaining that Defendants' actions are not subject to judicial review under APA). Plaintiffs have, accordingly, met their burden to show that their claim arising under section 504 of the Rehabilitation Act provides a statutory basis on which to secure injunctive relief.

b.  Merits of Claim

Defendants briefly raise a second argument against Plaintiffs' likelihood of success on the merits, which this Court can dispose of almost as quickly. The Government argues that because it provides other non-auditory means for Plaintiffs to access information conveyed in the coronavirus briefings, the Rehabilitation Act does not require it also to provide ASL interpretation. <u>Id.</u> at 10. The Court disagrees.

18

The Rehabilitation Act requires that people who are disabled within the meaning of the Act have "meaningful access" to the federal government's programs or activities.  See Alexander v. Choate, 469 U.S. 287, 301 (1985); American Council of the Blind v. Mnuchin, 878 F.3d 360, 363 (D.C. Cir. 2017).  The standard lacks "precise boundaries," American Council of The Blind v. Snow, 311 F. Supp. 2d 86, 89 (D.D.C. 2004), but the relevant inquiry is "whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003); see also Paulson, 525 F.3d at 1267 ("Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit.").  "[T]o assure meaningful access, reasonable accommodations . . . may have to be made." Alexander, 469 U.S. at 301.  As the Circuit has noted, "[D]eaf individuals lack meaningful access to government activities or programs without the provision of interpretive assistance." Paulson, 525 F.3d at 1268 (citing Randolph v. Rogers, 170 F.3d 850, 858 (8th Cir. 1999), Rothschild v. Grottenthaler, 970 F.2d 286, 291 (2d Cir. 1990), and United States v. Bd. Of Trs. For the Univ. of Ala., 908 F.2d 740, 748 (11th Cir. 1990)).

Individual Plaintiffs contend that they lack meaningful access to the substance of the briefings because "captioning is often delayed and inaccurate," Axelrod Decl., ¶ 4; Forsey Decl., ¶ 4, and they have difficulty "understand[ing] captioning on television when the content is complex, such as when there is information about a health pandemic."  Fleetwood Decl., ¶ 3; Rivera Decl., ¶ 3; Strail Decl., ¶ 3.  Plaintiffs do not directly address Defendants' provision of written English transcripts following briefings, but do declare that ASL — not English — is their primary and preferred language.  See Axelrod Decl., ¶ 2; Forsey Decl., ¶ 2; Fleetwood Decl., ¶ 2; Rivera Decl., ¶ 2; Strail Decl., ¶ 2.  As NAD maintains, "Written English is not an effective

means of communication for many deaf individuals who have limited English capabilities, particularly for complex and important topics such as COVID-19 and related issues of public health." Rosenblum Decl., ¶ 6. Even when written English is provided, then, deaf people who rely on ASL "cannot effectively receive the messages conveyed at the White House press briefings," id., no matter whether the messages are conveyed in real time through closed captioning or after the fact via transcripts.

Closed captioning and transcripts may constitute a reasonable accommodation under some circumstances, but not here. As another court explained in rejecting a state government's similar arguments, these "accommodations — however well-intentioned — simply do not provide 'meaningful access in the circumstances [presented] here.'" Martinez v. Cuomo, No. 20-3338, 2020 WL 2393285 at *5 (S.D.N.Y. May 12, 2020) (alteration in original) (quoting Disabled in Action v. Bd. of Elections of New York, 752 F.3d 189, 201 (2d Cir. 2014)) (granting preliminary injunction to require governor to provide in-frame ASL interpretation during televised briefings about COVID-19); see also Paulson, 525 F.3d at 1259, 1269–70 (rejecting government's argument that "availability of portable currency readers to identify denominations and credit cards as an alternative to cash" constitutes meaningful access to currency for blind persons).

This is enough for Plaintiffs to establish a likelihood of success on the merits of their Rehabilitation Act count.

B. Irreparable Harm

As set forth above, in addition to showing such likelihood of success, a party seeking a preliminary injunction must demonstrate that its injury is "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Chaplaincy of Full Gospel

Churches, 454 F.3d at 297 (quoting Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)) (internal quotation marks omitted).  The injury must also be "both certain and great; it must be actual and not theoretical."  Id. (quoting Wisconsin Gas, 758 F.2d at 674).  Finally, the injury must be "beyond remediation." Id.

There is little debate on this prong here.  Plaintiffs seek access to information about their health and safety, as well as updates on the economy and the development of a vaccine.  See Compl., ¶ 1; Pl. Mot. Memo at 17–18.  They emphasize that, absent ASL interpretation, they will suffer irreparable harm because they will be "denied timely access to . . . critical information, leaving them less able to comply with current orders and advice, less able to prepare for the future, and more anxious about current conditions and the future."  Pl. Mot. Memo at 2–3 (quoting Martinez, 2020 WL 2393285, at *6).  As an example, the importance of mask wearing was not generally explained in the early months of the pandemic, but as scientists learned more about the virus, the White House's briefings included information on the importance of regular mask wearing by the general public.  See Remarks by President Trump in Press Briefing (July 21, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-072120/ (encouraging everyone to wear a mask).  Defendants recycle the point that Plaintiffs will not suffer irreparable harm given the alternative formats in which the information is provided, including closed captioning.  See Def. Opp. at 23.  As the Court has already considered and rejected that position, and because Defendants raise no other arguments in briefing, see id., Plaintiffs have sufficiently prevailed on this factor as well.

C.  Balance of the Equities and the Public Interest

The last factors, which the Court considers together, examine "the balance of equities" and "the public interest."  Sherley, 644 F.3d at 392 (quoting Winter, 555 U.S. at 20); see also

League of Women Voters, 838 F.3d at 12.  When the non-moving party is the Government, these two considerations merge.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  Plaintiffs have so readily satisfied this standard that little need be said.

Plaintiffs seek access to critical public-health information to benefit themselves and their loved ones.  While Defendants may take issue with the scope of Plaintiffs' requested remedy, which the Court addresses next, they have not counterbalanced Plaintiffs' harms.  Indeed, at no point have Defendants said that providing an ASL interpreter to guarantee that access would be too burdensome.  See Def. Op. at 23.  The Court also agrees with Plaintiffs that it is in the public interest for them to receive up-to-date information during the pandemic, see Pl. Mot. Memo at 3, particularly given the rapidly evolving science on the nature of the virus's spread.

Having cleared the bar on this factor as well as the others, the Court concludes that Plaintiffs are entitled to some form of preliminary relief here.

D.  Relief

One seminal question remains: what form should that relief take and against whom?  The Court addresses the two issues in reverse order.

Plaintiffs have sued President Trump and Vice President Pence, among other Defendants, and want this Court to order both men to use in-frame ASL interpretation during all White House briefings about the coronavirus that they conduct and that are announced in advance.  See Pl. Supp. at 3.  Even if this Court can, in some circumstances, issue declaratory relief against the President, see Knight First Amendment Inst. at Columbia Univ. v. Trump, 928 F.3d 226, 230, 233 (2d Cir. 2019), there are uncertainties about the extent of its power to enjoin him and the Vice President to act in a specific way.  See, e.g., Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992) (citing Nixon v. Fitzgerald, 457 U.S. 731, 748 n. 27 (1982)); Mississippi v. Johnson,

71 U.S. (4 Wall). 475, 499 (1886); Newdow v. Roberts, 603 F.3d 1002, 1013 (D.C. Cir. 2010);

Knight First Amendment Inst. at Columbia Univ. v. Trump, 302 F. Supp. 3d 541, 575 (S.D.N.Y.

2018), aff'd, 928 F.3d at 230.  The Court can fortunately sidestep this thicket, however, because,

either as a matter of mootness or comity, enjoining other parties in the White House can provide

Plaintiffs with the relief it believes warranted.  Cf. Karem v. Trump, 960 F.3d 656, 668 (D.C.

Cir. 2020) (upholding injunction against Press Secretary but not President when plaintiff did not

rebut defendants' contention that relief could not run against President); Knight First

Amendment Inst., 302 F. Supp. 3d at 579 ("[A]s a matter of comity, courts should normally

direct legal process to a lower Executive official even though the effect of the process is to

restrain or compel the President.") (quoting Nixon v. Sirica, 487 F.2d 700, 709 (D.C. Cir. 1973)

(en banc)).  Indeed, beyond digging up arguments that they had conceded in briefing about who

is an eligible defendant under section 504, Defendants here do not contest that this Court can

issue injunctive relief against others named here — viz., the Executive Offices of the President

and Vice-President, the White House Office, and Press Secretary McEnany.  See ECF No. 13

(August 26, 2020, Hearing Transcript) at 28; see Karem, 960 F.3d at 668 (upholding injunction

against Press Secretary).

  This then leads to the question of the precise contours of the relief that this Court should

order.  As Plaintiffs have come to recognize, it cannot provide some of what they originally

requested.  For example, this Court cannot order Defendants to require television broadcast

outlets to carry video of an ASL interpreter when showing the coronavirus briefings; indeed,

what private broadcasters choose to air, when, and in what format is beyond the Court's control.

  In supplemental briefing, Plaintiffs narrowed the scope of their requested relief to the

following:

    a.  For purposes of the preliminary injunction, the term "White House coronavirus briefings" is defined as those briefings that (i) are conducted by any Defendant (including the White House Press Office), (ii) involve notice that is publicly disseminated in advance of commencing, and (iii) have as one of their purposes discussing the coronavirus pandemic, including but not limited to information related to the spread or containment of the virus; updates regarding vaccinations or treatments; government action taken in response to the pandemic; and any health, education, or economic issues and updates related to the pandemic. For the avoidance of doubt, White House coronavirus briefings are not limited to those that occur in the White House Press Briefing Room.

    b.  Defendants must provide in-frame ASL interpretation at all White House coronavirus briefings by (a) placing an ASL interpreter physically near the speaker at such briefings, and/or (b) creating a live feed of a PIP ASL interpreter and making that PIP feed available to all entities broadcasting the briefings (including WHCA and the pool feed of the television networks) in a manner that allows those entities to include the PIP feed on their live broadcasts.

    c.  Defendants must include an ASL interpreter in the WHCA feed for all White House coronavirus briefings, either by including in the frame the ASL interpreter located physically near the speaker, or by carrying the PIP feed of the ASL interpreter.

Pl. Supp. at 3.

The first point addresses the question of <u>when</u> — in other words, the circumstances in which ASL interpretation is sought — and Defendants do not dispute that this definition is appropriate.  The harder logistical issues surround the second and third proposals, which detail <u>what</u> Defendants must do.  To reformulate Plaintiffs' proposals somewhat, one reasonable option is to require the White House to offer simultaneous in-frame ASL interpretation on its live feed posted on YouTube and on its delayed feed, which is posted to other social-media platforms. Defendants could do so either by having an ASL interpreter physically near the speaker or by creating a simultaneous live feed of such interpreter elsewhere, given the constraints of the Press Briefing Room.  <u>See</u> Deere Decl., ¶ 9 ("Press Briefing Room is a small space"); Def. Opp. at 3

24

("[S]eating has been further limited to facilitate social distancing requirements in Press Briefing Room"). The Government has not maintained that complying with such a remedy would be too burdensome or impracticable. Indeed, it could arguably also provide the video of that same ASL interpreter to media outlets or enable those outlets to film the interpreter at the same time that the White House does, but the Court again imposes no mandate on the media.

To determine the optimal approach, the Court will conduct another hearing, at which the parties may discuss the specifics of the above proposal. In the interim, the Court encourages them to confer in the hopes of reaching some agreement on format.

## IV.   Conclusion

The Court, consequently, will issue a contemporaneous Order granting Plaintiffs' Motion for Preliminary Injunction in part, but staying such Order until the specifics can be resolved.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  September 9, 2020